WESTINGHOUSE ELECTRIC CORP. *v.* TULLY ET AL.

No. 81–2394.   Argued November 1, 1983—Decided April 24, 1984

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Paul M. Dodyk* argued the cause for appellant. With him on the briefs was *David A. Barrett.*

*Peter H. Schiff* argued the cause for appellees. With him on the brief were *Robert Abrams,* Attorney General of New York, and *Francis V. Dow,* Assistant Attorney General.*

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case, we are confronted with the question of the constitutionality of a franchise tax credit afforded by the State of New York to certain income of Domestic International Sales Corporations.

I

The tax credit in issue was enacted as part of the New York Legislature's response to additions to and changes in the United States Internal Revenue Code of 1954 effectuated by the Revenue Act of 1971, Pub. L. 92–178, §§ 501–507, 85 Stat. 535. In an effort to "provide tax incentives for U. S. firms to increase their exports," H. R. Rep. No. 92–533, p. 9 (1971); S. Rep. No. 92–437, p. 12 (1971), Congress gave special recognition to a corporate entity it described as a "Domestic International Sales Corporation" or "DISC." §§ 991–997 of the Code, 26 U. S. C. §§ 991–997. A corporation qualifies as a DISC if substantially all its assets and

---

*George Deukmejian,* Attorney General, and *Charles C. Kobayashi,* Deputy Attorney General, filed a brief for the State of California as *amicus curiae.*

gross receipts are export-related. §§ 992(a), 993.[1] Under federal law, a DISC is not taxed on its income. § 991. Instead, a portion of the DISC's income—labeled "deemed distributions"—is attributed to the DISC's shareholders[2] on a

[1] Specifically, § 992(a)(1) provides that a corporation qualifies for DISC treatment for any taxable year in which it

"is incorporated under the laws of any State and satisfies the following conditions for the taxable year:

"(A) 95 percent or more of the gross receipts (as defined in section 993(f)) of such corporation consist of qualified export receipts (as defined in section 993(a)),

"(B) the adjusted basis of the qualified export assets (as defined in section 993(b)) of the corporation at the close of the taxable year equals or exceeds 95 percent of the sum of the adjusted basis of all assets of the corporation at the close of the taxable year,

"(C) such corporation does not have more than one class of stock and the par or stated value of its outstanding stock is at least $2,500 on each day of the taxable year, and

"(D) the corporation has made an election pursuant to subsection (b) to be treated as a DISC and such election is in effect for the taxable year."

Under § 993(a)(1), "the qualified export receipts of a corporation are—

"(A) gross receipts from the sale, exchange, or other disposition of export property,

"(B) gross receipts from the lease or rental of export property, which is used by the lessee of such property outside the United States,

"(C) gross receipts for services which are related and subsidiary to any qualified sale, exchange, lease, rental, or other disposition of export property by such corporation,

"(D) gross receipts from the sale, exchange, or other disposition or qualified export assets (other than export property),

"(E) dividends (or amounts includible in gross income under section 951) with respect to stock of a related foreign export corporation (as defined in subsection (e)),

"(F) interest on any obligation which is a qualified export asset,

"(G) gross receipts for engineering or architectural services for construction projects located (or proposed for location) outside the United States, and

"(H) gross receipts for the performance of managerial services in furtherance of the production of other qualified export receipts of a DISC."

[2] The majority of DISCs have only one shareholder, for most are wholly owned by a single corporate parent. Internal Revenue Service, 3 Statistics of Income Bulletin, No. 2, p. 10 (1983).

current basis, whether or not that portion is actually paid or distributed to them. § 995. Under the statutory provisions in effect during the calendar years 1972 and 1973 (the tax years in question in this case), 50% of a DISC's income was deemed distributed to its shareholders. 85 Stat. 544.[3] Taxes on the remaining income of the DISC—labeled "accumulated DISC income"—are *deferred* until either that accumulated income is actually distributed to the shareholders or the DISC no longer qualifies for special tax treatment. § 996 of the Code, 26 U. S. C. § 996.

Enactment of the federal DISC legislation caused revenue officials in the State of New York some concern. New York does not generally impose its franchise tax on distributions received by a parent from a subsidiary; instead, the subsidiary is taxed directly to the extent it does business in the State. See N. Y. Tax Law § 208.9(a)(1) (McKinney 1966). Given the State's tax structure, had New York followed the federal lead in not taxing DISCs, a DISC's income would not have been taxed by the State. See New York State Division of the Budget, Report on A. 12108–A and S. 10544, pp. 1, 5–6 (May 23, 1972), reprinted in Bill Jacket of 1972 N. Y. Laws, ch. 778, pp. 13, 17–18 (Budget Report). A budget analyst reported to the legislature that if no provision were made to tax DISCs, New York might suffer revenue losses of as much as $20–$30 million annually. *Id.*, at 20. On the other hand, the analyst warned that state taxation of DISCs would dis-

---

[3] Subsequent to the tax years in question, the law governing DISCs was changed to decrease the amount of DISC income given preferential treatment. The Tax Reform Act of 1976, Pub. L. 94–455, § 1101(a), 90 Stat. 1655, limited DISC benefits to taxable income attributable to gross receipts in excess of 67% of the average export gross receipts in a 4-year base period. DISCs with adjusted taxable income of $100,000 or less are exempt from that provision. §§ 995(e)(3) and (f) of the Code, 26 U. S. C. §§ 995(e)(3) and (f). The Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, § 204(a), 96 Stat. 423, increased from 50% to 57.5%, for tax years beginning in 1983, the portion of DISC income deemed distributed to the DISC's shareholders. § 291(a)(4) of the Code, 26 U. S. C. § 291(a)(4).

courage their formation in New York and also discourage the manufacture of export goods within the State. *Id.*, at 18.[4]

With these conflicting considerations in mind, New York enacted legislation pertaining to the taxation of DISCs. 1972 N. Y. Laws, chs. 778 and 779 (McKinney), codified as N. Y. Tax Law §§ 208 to 219–a (McKinney Supp. 1983–1984). The enacted provisions require the consolidation of the receipts, assets, expenses, and liabilities of the DISC with those of its parent. § 208.9(i)(B). The franchise tax is then assessed against the parent on the basis of the consolidated amounts. In an attempt to "provide a positive incentive for increased business activity in New York State," however, the legislature provided a "partially offsetting tax credit." Budget Report, at 18. The result of the credit is to lower the effective tax rate on the accumulated DISC income reflected in the consolidated return to 30% of the otherwise applicable franchise tax rate. The DISC credit, significantly, is limited to gross receipts from export products "shipped from a regular place of business of the taxpayer within [New York]." § 210.13(a)(2). The credit is computed by (1) dividing the gross receipts of the DISC derived from export property shipped from a regular place of business within New York by the DISC's total gross receipts derived from the sale of export property; (2) multiplying that quo-

---

[4] The State considered two possible methods of DISC taxation. Under the first, a DISC would be taxed directly on its income. Use of this method would encourage formation of DISCs outside the State, so that New York would obtain no tax revenue from them. A direct tax on DISCs would also engender administrative costs. In general, New York uses federal taxable income as the base from which to determine income taxable by the State. Since a DISC would have no federal taxable income, a method of determining a DISC's taxable income for state-tax purposes would have to be devised. Budget Report, at 18.

Under the second method, a DISC's income would be attributed to the DISC's shareholders and taxed as income to them. New York revenue officials feared that full taxation of the DISC's income in this manner would discourage the manufacture of export products within the State. *Ibid.*

tient (the DISC's New York export ratio) by the parent's New York business allocation percentage;[5] (3) multiplying that product by the New York tax rate applicable to the parent; (4) multiplying that product by 70%; and (5) multiplying that product by the parent's attributable share of the accumulated income of the DISC for the year. §§ 210.13(a)(2) to (5).

## II

The basic facts are stipulated. Appellant Westinghouse Electric Corporation (Westinghouse) is a Pennsylvania corporation engaged in the manufacture and sale of electrical equipment, parts, and appliances. Westinghouse is qualified to do business in New York, and it regularly pays corporate income and franchise taxes to that State. Among Westinghouse's subsidiaries is Westinghouse Electric Export Corporation (Westinghouse Export), a Delaware corporation wholly owned by Westinghouse, that qualifies as a federally tax-exempt DISC. Westinghouse Export acts as a commission agent on behalf of both Westinghouse and Westinghouse's other affiliates for export sales of products manufactured in the United States and services related to those products. All of Westinghouse Export's income in 1972 and 1973 consisted of commissions on export sales. On both its 1972 and 1973 federal income and New York State franchise tax returns, Westinghouse included as income, and paid taxes on, an amount of deemed distributed income equal to about half of Westinghouse Export's income. In 1972, Westinghouse Export's income was about $26 million, and Westinghouse included in its consolidated return approximately $13 million of income deemed distributed from

---

[5] A corporation's business allocation percentage for New York tax purposes is computed according to a formula set forth in N. Y. Tax Law § 210.3 (McKinney Supp. 1983–1984). The percentage is, basically, the average of the percentages of the corporation's property situated, income earned, and payroll distributed within the State.

Westinghouse Export.[6] In 1973, the income of Westinghouse Export was approximately $58 million; Westinghouse reported almost $30 million of that amount as deemed distributed income.[7] Westinghouse, however, did not include the DISC's *accumulated* income in its consolidated returns.

The appellees, as the New York State Tax Commission (Tax Commission), sought to include in Westinghouse's consolidated income the accumulated DISC income; that is, the Tax Commission computed Westinghouse's taxable income by first combining all of Westinghouse Export's income with that of Westinghouse, pursuant to N. Y. Tax Law § 208.9(i) (B) (McKinney Supp. 1983–1984). The Commission gave Westinghouse the benefit of the DISC export credit for the approximately 5% of Westinghouse Export's receipts each year that could be attributed to New York shipments.[8] After applying the relevant allocation and tax percentages, the Tax Commission asserted deficiencies in Westinghouse's franchise tax of $73,970 (later corrected to $71,970) plus interest for 1972 and $151,437 plus interest for 1973. App. 42, 46.

Westinghouse filed a petition for redetermination of the proposed deficiencies. By its petition, as later perfected, Westinghouse contended that by requiring it to compute its franchise tax liability on a consolidated basis with Westinghouse Export, the Tax Commission was taxing income that did not have a jurisdictional nexus to the State, in violation of

---

[6] More precisely, Westinghouse Export's reported income for 1972 was $25,987,000. The amount of the deemed distribution for 1972 was $12,956,500. App. 43.

[7] Westinghouse Export's reported income for 1973 was $57,948,738. The amount of the deemed distribution for 1973 was $29,838,006. *Ibid.*

[8] The Tax Commission was willing to allow Westinghouse a $2,569.77 credit for the 4.771297% of Westinghouse Export's 1972 receipts attributable to goods shipped from New York ports, and a $6,098.22 credit for the 5.523182% of the DISC's 1973 receipts attributable to New York shipments. *Id.,* at 46.

the Commerce and Due Process Clauses of the United States Constitution. Westinghouse further contended that limiting the tax benefit of the DISC export credit to gross receipts from shipments attributable to a New York place of business violated the Commerce, Due Process, and Equal Protection Clauses. The Commission declined to entertain Westinghouse's contentions, on the ground that, as an administrative agency, it lacked jurisdiction to pass upon "the constitutionality of the laws of the State of New York." *Id.*, at 47.

Westinghouse then brought suit in the New York Supreme Court for review of the tax determination, again raising its constitutional claims. The case was transferred to the Appellate Division. That court, by a 3-to-2 vote, found the portion of the law that requires accumulated income of the DISC to be added to the consolidated return, § 208.9(i)(B), to be an unconstitutional burden on foreign commerce. 82 App. Div. 2d 988, 440 N. Y. S. 2d 397 (1981). The Appellate Division based its holding on the fact that Congress intended to exempt DISC income from current taxation. *Id.*, at 989, 440 N. Y. S. 2d, at 399–400. This decision made it unnecessary for the court to consider the constitutionality of New York's geographical limitation on the DISC export credit, because the credit applies only to accumulated DISC income. The Appellate Division, however, went on to reject Westinghouse's constitutional challenges to New York's taxation of deemed distributed income. *Ibid.*, 440 N. Y. S. 2d, at 400.

The Tax Commission took an appeal to the New York Court of Appeals from that portion of the Appellate Division's judgment invalidating § 208.9(i)(B), and Westinghouse cross-appealed from that portion of the judgment upholding the taxation of deemed distributions. Westinghouse again made the constitutional arguments it had raised below. In a unanimous opinion, the Court of Appeals reinstated the determination of the Tax Commission. 55 N. Y. 2d 364, 434 N. E. 2d 1044 (1982). The Court of Appeals first held that Congress' decision not to tax DISCs at the federal level did

not pre-empt a State from taxing a DISC. *Id.*, at 372–373, 434 N. E. 2d, at 1047–1048. The court also rejected Westinghouse's argument that the State lacked the jurisdictional nexus necessary to satisfy the minimal due process standards on which the right to tax must be predicated. Finally, the court rejected Westinghouse's claim that the credit provided for in § 210.13(a) impermissibly subjected Westinghouse's export sales from a non-New York place of business to a higher tax rate than that on comparable sales shipped from a regular place of business in New York. The court noted that the credit was devised by the State to provide shareholders of DISCs with state-tax incentives akin to those enacted by Congress. The only difference was that, while Congress had chosen to provide the benefit in the form of a tax deferral, the New York Legislature had elected to use a credit. *Id.*, at 374–376, 434 N. E. 2d, at 1049–1050.

The court acknowledged that the credit was intended to ensure that New York would not lose its competitive position vis-à-vis other States, since other States were also expected to offer tax benefits to DISCs. It traced the steps required in calculating the tax credit and concluded: "Obviously, the business allocation percentage plays an integral role in computing the tax credit." *Id.*, at 375, 434 N. E. 2d, at 1050. Use of the business allocation percentage, the court reasoned, ensures that in taxing DISC income, the State is taxing only that DISC income that has a jurisdictional nexus with the State. The credit simply forgives a portion of the tax New York has a right to levy. *Id.*, at 376, 434 N. E. 2d, at 1050. The portion of the tax to be forgiven is determined by reference to shipments of export property from a regular place of business in New York. The court was of the opinion that this method satisfies due process and that any effect on interstate commerce is too indirect to run afoul of the Commerce Clause. *Ibid.*

We noted probable jurisdiction only with respect to the question of the constitutionality of the DISC tax credit, 459

U. S. 1144 (1983), and we now reverse the judgment of the New York Court of Appeals in that respect.

## III

The Tax Commission seeks to convince us that the DISC tax credit forgives merely a portion of the tax that New York has jurisdiction to levy. All the accumulated income of a DISC is attributed to its parent for tax purposes. Under unitary tax principles, however, if the parent has a regular place of business outside New York, the State will not actually tax the full amount of the accumulated income. Only a portion of the parent's net income (which includes the accumulated DISC income) will be subject to tax in New York. That portion is determined by reference to a business allocation percentage determined by averaging the percentages of in-state property, payroll, and receipts. See N. Y. Tax Law § 210.3 (McKinney Supp. 1983–1984). This Court long has upheld, subject to certain restraints, the use of a formula-apportionment method to determine the percentage of a business' income taxable in a given jurisdiction. *Container Corp.* v. *Franchise Tax Board,* 463 U. S. 159, 169–171 (1983); see *Illinois Central R. Co.* v. *Minnesota,* 309 U. S. 157 (1940); *Hans Rees' Sons, Inc.* v. *North Carolina ex rel. Maxwell,* 283 U. S. 123 (1931); *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Comm'n,* 266 U. S. 271 (1924); *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113 (1920).

The Tax Commission's argument that New York employs a constitutionally acceptable allocation formula, in our view, serves only to obscure the issue in this case. The acceptability of the allocation formula employed by the State of New York is not relevant to the question before us. The fact that New York is attempting to tax only a fairly apportioned percentage of a DISC's accumulated income does not insulate from constitutional challenge the State's method of allowing the DISC export credit. New York's apportionment procedure determines what portion of a business' income is within the jurisdiction of New York. Nothing about the apportion-

ment process releases the State from the constitutional restraints that limit the way in which it exercises its taxing power over the income within its jurisdiction.

Here, Westinghouse argues that the State of New York has sought to exercise its taxing power over accumulated DISC income in a manner that offends the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment. This challenge is not foreclosed by our holding that New York's allocation of DISC income is constitutionally acceptable. See 459 U. S. 1144 (1983) (dismissing for want of a substantial federal question Westinghouse's challenge to method of allocating DISC income to parent). "Fairly apportioned" and "nondiscriminatory" are not synonymous terms. It is to the question whether the method of allowing the credit is discriminatory in a manner that violates the Commerce Clause that we now turn.

The Tax Commission argues that multiplying the allowable credit by the New York export ratio of the DISC merely ensures that the State is not allowing a parent corporation to claim a tax credit with respect to DISC income that is not taxable by the State of New York. This argument ignores the fact that the percentage of the DISC's accumulated income that is subject to New York franchise tax is determined by the parent's business allocation percentage, not by the export ratio. In computing the allowable credit, the statute requires the parent to factor in its business allocation percentage. § 210.13(a). This procedure alleviates the State's fears that it will be overly generous with its tax credit, for once the adjustment of multiplying the allowable DISC export credit by the parent's business allocation percentage has been accomplished, the tax credit has been fairly apportioned to apply only to the amount of the accumulated DISC income taxable to New York. From the standpoint of fair apportionment of the credit, the additional adjustment of the credit to reflect the DISC's New York export ratio is both inaccurate and duplicative.

It is this second adjustment, made only to the credit and not to the base taxable income figure, that has the effect of treating differently parent corporations that are similarly situated in all respects except for the percentage of their DISCs' shipping activities conducted from New York. This adjustment has the effect of allowing a parent a greater tax credit on its accumulated DISC income as its subsidiary DISC moves a greater percentage of its shipping activities into the State of New York. Conversely, the adjustment decreases the tax credit allowed to the parent for a given amount of its DISC's shipping activity conducted from New York as the DISC increases its shipping activities in other States.[9] Thus, not only does the New York tax scheme

---

[9] Hypothetical examples demonstrate that similarly situated corporations, each operating a wholly owned DISC, would face different tax assessments in New York depending on the location from which the DISC shipped its exports. For a parent corporation that has an income of $10,000, a wholly owned DISC with accumulated income of $500, and a New York business allocation percentage of 40%, and assuming an applicable New York tax rate of 10%, Table A shows the difference in New York tax liability in situations where the DISC ships 100%, 50%, or 0% of its exports from locations in New York:

TABLE A

| % of DISC Shipment from New York | 100% | 50% | 0% |
|---|---|---|---|
| Parent's Income | $10,000 | $10,000 | $10,000 |
| DISC Accumulated Income | 500 | 500 | 500 |
| Consolidated Income | 10,500 | 10,500 | 10,500 |
| New York Business Allocation % | 40% | 40% | 40% |
| Income Taxable by New York | 4,200 | 4,200 | 4,200 |
| New York Tax Rate | 10% | 10% | 10% |
| Tax Liability (Pre-Credit) | 420 | 420 | 420 |
| DISC Credit Allowed | 14 | 7 | 0 |
| Final Tax Assessment | 406 | 413 | 420 |

The DISC credit allowed is computed by multiplying the percentage of the DISC's export revenues derived from New York shipments (100%, 50% or 0%) by the parent's New York business allocation percentage (40%); multiplying that product by the parent's New York tax rate (10%); multiplying

"provide a positive incentive for increased business activity in New York State," Budget Report, at 18, but also it penalizes increases in the DISC's shipping activities in other States.

---

that product by the credit percentage (70%); and, finally, multiplying that product by the amount of the accumulated DISC income attributable to the parent ($500).

We are not unmindful of one factor that results when a corporation is induced to move more of its export business into the State of New York: the parent's business allocation percentage will be adjusted upward to reflect the increased percentage of DISC activity in the State. The increased tax liability will more than offset the increased credit, so that the parent's tax liability to the State of New York, in absolute terms, increases. The parent's effective New York tax rate, however, decreases as its DISC does a greater percentage of its shipping from New York. In the next example, each parent is assumed to do 40% of its own business from New York, so that $4,000 of its income is attributable to New York activity. Each DISC has $500 of accumulated income, but differs from the others in terms of the percentage of its income that results from shipping exports from New York ports. Assuming that the same amount of payroll and property are required to generate each dollar of the DISC's income, the business allocation percentage increases proportionately as the percentage of the DISC's income derived from New York shipping activity increases:

## TABLE B

| % of DISC Shipment from New York | 100% | 50% | 0% |
|---|---|---|---|
| Parent's Income | $10,000 | $10,000 | $10,000 |
| DISC Accumulated Income | 500 | 500 | 500 |
| Consolidated Income | 10,500 | 10,500 | 10,500 |
| New York Business Allocation % | 42.86% | 40.48% | 38.10% |
| Income Taxable by New York | 4,500 | 4,250 | 4,000 |
| New York Tax Rate | 10% | 10% | 10% |
| Tax Liability (Pre-Credit) | 450 | 425 | 400 |
| DISC Credit Allowed | 15 | 7 | 0 |
| Final Tax Assessment | 435 | 418 | 400 |
| Effective Tax Rate on Income Taxable in New York | 9.67% | 9.84% | 10% |

The third example demonstrates the most pernicious effect of the credit scheme. In this example, each parent and its DISC maintain the same

In determining whether New York's method of allowing a DISC export credit violates the Commerce Clause, the foundation of our analysis is the basic principle that "'[t]he very purpose of the Commerce Clause was to create an area of free trade among the several States.'" *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 328 (1977), quoting *McLeod* v. *J. E. Dilworth Co.*, 322 U. S. 327, 330 (1944);

---

amount of business in New York as do the other parent-DISC organizations, but the DISCs differ with respect to the amount of export shipping they do from outside New York. Each parent has $10,000 of income and each does 40% of its own business in New York. In addition, each DISC ships the goods that account for $3,000 of its income from New York. The only difference among the three parent-DISC organizations is the amount of DISC activity each conducts outside New York. As the DISC conducts a greater amount of shipping from outside New York, the DISC export credit allowed the parent decreases. Thus, New York lowers the incentive it awards for in-state DISC activity as the DISC increases its out-of-state activity:

### TABLE C

| | | | |
|---|---|---|---|
| % of DISC Shipment from New York | 100% | 75% | 60% |
| DISC Accumulated Income from New York Shipments | $3,000 | $3,000 | $3,000 |
| DISC Accumulated Income from Shipments from Other States | 0 | 1,000 | 2,000 |
| Total DISC Accumulated Income | 3,000 | 4,000 | 5,000 |
| Parent's Income | 10,000 | 10,000 | 10,000 |
| Consolidated Income | 13,000 | 14,000 | 15,000 |
| New York Business Allocation % | 53.85% | 50% | 46.67% |
| Income Taxable by New York | 7,000 | 7,000 | 7,000 |
| New York Tax Rate | 10% | 10% | 10% |
| Tax Liability (Pre-credit) | 700 | 700 | 700 |
| DISC Credit Allowed | 113 | 105 | 98 |
| Final Tax Assessment | 587 | 595 | 602 |

These examples illustrate what is inherent in the method devised by the New York Legislature for computing the DISC credit: the credit is awarded in a discriminatory manner on the basis of the percentage of a DISC's shipping conducted from within the State of New York.

accord, *Great Atlantic & Pacific Tea Co.* v. *Cottrell,* 424 U. S. 366 (1976). The undisputed corollary of that principle is that "'the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. . . . [T]he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States,'" including the States' power to tax. *Boston Stock Exchange,* 429 U. S., at 328, quoting *Freeman* v. *Hewit,* 329 U. S. 249, 252 (1946). For that reason, "[n]o State, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business.'" *Boston Stock Exchange,* 429 U. S., at 329, quoting *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 458 (1959). See also *Halliburton Oil Well Cementing Co.* v. *Reily,* 373 U. S. 64 (1963); *Nippert* v. *Richmond,* 327 U. S. 416 (1946); *I. M. Darnell & Son Co.* v. *Memphis,* 208 U. S. 113 (1908); *Guy* v. *Baltimore,* 100 U. S. 434 (1880); *Welton* v. *Missouri,* 91 U. S. 275 (1876).

We have acknowledged that the delicate balancing of the national interest in free and open trade and a State's interest in exercising its taxing powers requires a case-by-case analysis and that such analysis has left "'much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation.'" *Boston Stock Exchange,* 429 U. S., at 329, quoting *Northwestern States,* 358 U. S., at 457. In light of our decision in *Boston Stock Exchange,* however, we think that there is little room for such "controversy and confusion" in the present litigation. The lessons of that case, as explicated further in *Maryland* v. *Louisiana,* 451 U. S. 725 (1981), are controlling.

In both *Maryland* v. *Louisiana* and *Boston Stock Exchange,* the Court struck down state tax statutes that

encouraged the development of local industry by means of taxing measures that imposed greater burdens on economic activities taking place outside the State than were placed on similar activities within the State. In *Maryland* v. *Louisiana*, the Court held that Louisiana's "First-Use" tax—which imposed a tax on natural gas brought into the State while giving local users a series of exemptions and credits—violated the Commerce Clause because it "unquestionably discriminate[d] against interstate commerce in favor of local interests." 451 U. S., at 756. Similarly, in *Boston Stock Exchange*, the Court held unconstitutional a New York stock-transfer tax that reduced the tax payable by nonresidents when the tax involved an in-state (rather than an out-of-state) sale and applied a maximum limit to the tax payable on any in-state (but not out-of-state) sale. See 429 U. S., at 332. The stock-transfer tax was declared unconstitutional because it violated the principle that "no State may discriminatorily tax the products manufactured or the business operations performed in any other State." *Id.*, at 337. The tax schemes rejected by this Court in both *Maryland* v. *Louisiana* and *Boston Stock Exchange* involved transactional taxes rather than taxes on general income. That distinction, however, is irrelevant to our analysis. The franchise tax is a tax on the income of a business from its aggregated business transactions. It cannot be that a State can circumvent the prohibition of the Commerce Clause against placing burdensome taxes on out-of-state transactions by burdening those transactions with a tax that is levied in the aggregate—as is the franchise tax—rather than on individual transactions.

Nor is it relevant that New York discriminates against business carried on outside the State by disallowing a tax credit rather than by imposing a higher tax. The discriminatory economic effect of these two measures would be identical. New York allows a 70% credit against tax liability for all shipments made from within the State. This provision is

indistinguishable from one that would apply to New York shipments a tax rate that is 30% of that applied to shipments from other States.[10]  We have declined to attach any constitutional significance to such formal distinctions that lack economic substance.  See, *e. g.*, *Maryland* v. *Louisiana,* 451 U. S., at 756 (tax scheme imposing tax at uniform rate on in-state and out-of-state sales held to be unconstitutional because discrimination against interstate commerce was "the necessary result of various tax credits and exclusions" that benefited only in-state consumers of gas).

The Tax Commission contends that the DISC export credit is a subsidy to American export business generally, and as such, is consistent with congressional intent in establishing DISCs and with the Commerce Clause.  We find no merit in this argument.  While the Federal Government may seek to increase domestic employment and improve our balance-of-payments by offering tax advantages to those who produce in the United States rather than abroad, a State may not encourage the development of local industry by means of taxing measures that "invite a multiplication of preferential trade areas" within the United States, in contravention of the Commerce Clause.  *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 356 (1951).  We note, also, that if the credit were truly intended to promote exports from the United States in general, there would be no reason to limit it to exports from within New York.

The Tax Commission argues that even if the tax is discriminatory, the burden it places on interstate commerce is not of constitutional significance.  It points to the facts that New York is a State with a relatively high franchise tax and that the actual effect of the credit, when viewed in terms of the whole New York tax scheme, is slight.  It argues that

---

[10] For example, Westinghouse was subject to a 9% tax rate in New York. On those shipments for which the 70% credit was allowed, the effective tax rate was 30% × 9%, or 2.7%.

the credit was not intended to divert new activity into New York, but, rather, to prevent the loss of economic activity already in the State at the time the tax on accumulated DISC income was enacted.   Whether the discriminatory tax diverts new business into the State or merely prevents current business from being diverted elsewhere, it is still a discriminatory tax that "forecloses tax-neutral decisions and . . . creates . . . an advantage" for firms operating in New York by placing "a discriminatory burden on commerce to its sister States."   *Boston Stock Exchange*, 429 U. S., at 331.[11]   The State has violated the prohibition in *Boston Stock Exchange* against using discriminatory state taxes to burden commerce in other States in an attempt to induce "'business operations to be performed in the home State that could more efficiently be performed elsewhere,'" *id.*, at 336, quoting *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 145 (1970), and to "'impose an artificial rigidity on the economic pattern of the industry,'" *id.*, at 146, quoting *Toomer* v. *Witsell*, 334 U. S. 385, 404 (1948).[12]   When a tax, on its face, is designed to have dis-

---

[11] In an effort to rebut the argument that the credit diverts economic activity from other States, the Tax Commission also submits that New York's share of the Nation's export business has declined since the institution of the credit.   Brief for Appellees 26–27.   This loss of export business does not refute appellant's argument.   Although the credit may not be large enough to halt or reverse the exodus of export business from New York, the discriminatory manner in which it is allowed no doubt has slowed the rate of decline in New York's share of national export shipping.

[12] The Tax Commission seeks to classify the tax credit at issue here as an indirect subsidy to export commerce, similar to provision and maintenance of ports, airports, waterways, and highways; to provision of police and fire protection; and to enactment of job-incentive credits and investment-tax credits.   *Id.*, at 21–22.   We reiterate that it is not the provision of the credit that offends the Commerce Clause, but the fact that it is allowed on an impermissible basis, *i. e.*, the percentage of a specific segment of the corporation's business that is conducted in New York.   As in *Boston Stock Exchange*, we do not "hold that a State may not compete with other States for a share of interstate commerce; such competition lies at the heart of a

criminatory economic effects, the Court "need not know how unequal the Tax is before concluding that it unconstitutionally discriminates." *Maryland* v. *Louisiana*, 451 U. S., at 760.[13]

The manner in which New York allows corporations a tax credit on the accumulated income of their subsidiary DISCs discriminates against export shipping from other States, in violation of the Commerce Clause. The contrary judgment of the New York Court of Appeals is therefore reversed.

*It is so ordered.*

---

free trade policy. We hold only that in the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State." 429 U. S., at 336–337.

[13] In an attempt to illustrate the insignificance of the size and practical effect of the credit at issue, the Tax Commission reminds us that rejection of the credit will have little effect on Westinghouse's tax bill for 1972 and 1973. In fact, in the absence of the credit, Westinghouse will owe approximately $8,500 more to the State of New York. See n. 8, *supra;* Tr. of Oral Arg. 20. This amount appears insignificant when compared to Westinghouse's New York tax bill of approximately $1 million for the 1972–1973 period. See *ibid.* Although the extent of the discrimination does not affect our analysis, we note that the controversy here is hardly over a *de minimis* amount when considered from the perspective of the amount of credit Westinghouse forwent because its DISC shipped the majority of its goods from ports outside New York. Westinghouse received $8,500 in credit because only 5% of its DISC's exports were shipped from New York. A similarly situated corporation whose DISC had conducted 100% of its export shipping from New York would have received a credit of approximately $170,000.