790 A.2d 252

PPG INDUSTRIES, INC., Appellant

v.

COMMONWEALTH of Pennsylvania, BOARD OF
FINANCE AND REVENUE, Appellee.

Supreme Court of Pennsylvania.

Argued Sept. 16, 1997.

Decided June 17, 1999.

Robert Hoffman, Christopher Zettlemoyer, Freed Smith Shaw McClay, Harrisburg, Stewart M. Weintraub, Philadelphia, Thomas D. Arbogast, Schnader, Harrison, Segal & Lewis, Pittsburgh, for PPG Industries.

D. Michael Fisher, Atty. Gen., John J., Butchar, Senior Deputy atty. Gen., for the Com.

James Leland Fritz, amicus curiae on behalf of Pennsylvania Chamber of Business & Industry.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

ZAPPALA, Justice.

This is a direct appeal from an order of the Commonwealth Court, affirming the order of the Board of Finance and Revenue (Board).[1]  For the reasons that follow, we reverse.

---

1. Pursuant to 42 Pa.C.S. § 723(b), any final order of the Commonwealth Court entered in any appeal from a decision of the Board of

Appellant, PPG Industries, Inc. (PPG), a Pennsylvania corporation, conducts manufacturing operations at plants located both within Pennsylvania and in other states. PPG administers all of these manufacturing operations from its Pittsburgh, Pennsylvania headquarters. At issue in this case is the capital stock tax on PPG's headquarters for the year 1983.

Section 602 of the Tax Reform Code of 1971 [2] (Code) imposes a capital stock tax on domestic entities and a franchise tax on the capital stock of foreign entities at the rate of ten mils (for the year 1983). The computations for the capital stock tax, Section 602(a), are distinct from those of the franchise tax, Section 602(b)(1). Under the Code, a domestic or foreign entity may elect to compute and pay its taxes under either computational method. *Commonwealth v. After Six, Inc.*, 489 Pa. 69, 413 A.2d 1017 (1980).

For its 1983 taxes, PPG elected to compute its headquarters' capital stock tax as if it was a foreign corporation paying a franchise tax. Under this method, the amount subject to tax is computed by multiplying the value of the corporation's capital stock by an apportionment factor. The apportionment factor is found by calculating the average of three ratios: tangible property in Pennsylvania to tangible property everywhere; payroll in Pennsylvania to payroll everywhere; and sales in Pennsylvania to sales everywhere.[3] The franchise tax statute permits a corporation to reduce its tax liability by excluding from the numerators of the fractions the value of the corporation's property, payroll and sales used in the administration of manufacturing in the Commonwealth.[4]

Mathematically, the apportionment factor is calculated as follows:

$$\text{Pennsylvania property—manufacturing exempt property} = \text{A}$$

Finance and Revenue is appealable to this Court, as of right. *See also* Pa.R.A.P. 1101(a)(2).

2. Act of March 4,1971, P.L. 6, *as amended,* 72 P.S. § 7602.

3. This method of apportionment is termed "three-factor apportionment."

4. This exclusion is termed the "manufacturing exemption."

$$\frac{\text{total property}}{\text{total property}}$$

$$\frac{\text{Pennsylvania payroll—manufacturing exempt payroll}}{\text{total payroll}} = B$$

$$\frac{\text{Pennsylvania sales—manufacturing exempt sales}}{\text{total sales}} = C$$

$$\text{Apportionment factor} = \frac{A + B + C}{3}$$

For its 1983 taxes, PPG exempted from taxation the value of property and payroll related to the administration of all its manufacturing operations and arrived at an apportionment factor of 2.7905%. PPG multiplied this apportionment factor by the value of its capital stock, $1.3 billion, to arrive at a taxable value of $36,276,500, with a resulting tax liability of $362,765.

After auditing PPG's 1983 tax return, the Department of Revenue and the Auditor General took the position that PPG's headquarters' property and payroll were entitled to the manufacturing exemption only insofar as the headquarters' employees administered manufacturing plants in Pennsylvania. At settlement, the auditors increased the apportionment factor to 5.1832% by determining that a greater portion of PPG's corporate headquarters' property and payroll were taxable.[5] The auditors multiplied this apportionment factor by the value of PPG's capital stock to arrive at a tax liability of $777,480. At resettlement, the auditors determined that the apportionment factor was 4.7750%, resulting in a taxable value of $71,625,000 and a tax of $716,250. The Department of Revenue accepted the auditor's changes.

PPG sought review of the resettlement and the Board affirmed. PPG filed a petition for review in Commonwealth Court, challenging on constitutional and statutory construction grounds the Board's order insofar as it related to the application of the capital stock tax manufacturing exemption to PPG's headquarters' property and payroll. An evidentiary hearing

5. The Department also increased the value of PPG's capital stock to $1.5 billion. PPG did not challenge that determination.

was held on April 7, 1995. PPG presented testimony concerning the extent to which its headquarters' operations concerned manufacturing generally, i.e., both within Pennsylvania and in other states. PPG argued that the Code granted the exemption to headquarters' operations that concerned manufacturing generally, and that if it did not, the Commonwealth's methodology violated the Commerce Clause of the United States Constitution.[6]

By memorandum opinion and order dated November 3, 1995, a panel of the Commonwealth Court, per Judge Pellegrini, rejected PPG's constitutional and statutory arguments and affirmed the resettlement. The majority determined that pursuant to the plain language of the Code, only manufacturing in Pennsylvania or that portion of PPG's corporate headquarters attributable to manufacturing in Pennsylvania was properly exempted. Senior Judge Rodgers dissented, accepting PPG's statutory argument that PPG's headquarters, to the extent it administered manufacturing, was manufacturing exempt whether the manufacturing took place in Pennsylvania or elsewhere.

PPG filed exceptions and a motion for *en banc* review. The motion was granted by order dated December 13, 1995. By opinion and order dated June 19, 1996, the Commonwealth Court *en banc*, per Judge Pellegrini, denied the exceptions. *PPG Industries, Inc. v. Commonwealth*, 681 A.2d 832 (Pa. Cmwlth.1996). The majority substantially adopted the panel's opinion. Judge McGinley filed a dissenting opinion in which he opined that the Department's application of the manufacturing exemption has a discriminatory effect on multi-state corporations with a low percentage of manufacturing in Pennsylvania, in violation of the Commerce Clause.

PPG filed a timely direct appeal to this Court. Oral argument was heard on September 16, 1997. In this appeal, PPG continues to assert its statutory and constitutional arguments.

■ Echoing Judge Rodgers's dissent to the Commonwealth Court's panel opinion, PPG first contends that the

6. U.S. Const. art. 1, § 8, cl. 3.

manufacturing exemption, embodied in Sections 602(a) and 602(b)(1),[7] applies to manufacturing generally and should not be so narrowly construed as to apply only to the proportion of PPG's headquarters' property and payroll deemed incident to PPG's in-state manufacturing operations. PPG essentially argues that so long as its Pennsylvania headquarters conducts activities incident to manufacturing, such as budgeting, sales, engineering and production planning, the actual manufacturing does not have to take place in the Commonwealth for PPG to enjoy the tax benefit of the manufacturing exemption.

In *Commonwealth v. Weldon Pajamas, Inc.*, 432 Pa. 481, 248 A.2d 204 (1968), this Court critically analyzed the manufacturing exemption:

Historically, the manufacturing exemption ... has been reserved to those corporations organized for manufacturing purposes and *actually engaged* in manufacturing in Pennsylvania.

7. Section 602(a) provides in pertinent part:

[E]very domestic entity ... shall be subject to ... a tax.... Provided, That ... the provisions of this section shall not apply to the taxation of the capital stock of entities organized for manufacturing, processing, research or development purposes, which is invested in and actually and exclusively employed in carrying on manufacturing, processing, research or development within the State ... shall pay the State tax ... upon such proportion of its capital stock, if any, as may be invested in any property or business not strictly incident or appurtenant to the manufacturing, processing, research or development business, . . . it being the object of this provision to relieve from State taxation ... only so much of the capital stock as is invested purely in the manufacturing, processing, research or development plant and business.

72 P.S. § 7602(a).

Section 602(b)(1) provides in pertinent part:

Every foreign entity ... shall be subject to and pay ... a franchise tax. .. Provided, That the manufacturing, processing, research and development exemptions contained under section 602(a) shall also apply to foreign corporations and in determining the relevant apportionment factors the numerator of the property, payroll, or sales factors shall not include any property, payroll or sales attributable to manufacturing, processing, research or development activities in the Commonwealth.

72 P.S. § 7602(b)(1).

Despite their slightly varying texts, the two provisions must be reconciled to provide an identical exemption. *Gilbert Associates, Inc. v. Commonwealth*, 498 Pa. 514, 447 A.2d 944 (1982).

* * *

Our analysis of the statute and its long and involved history convinces us that ... the legislature intended the manufacturing exemption to apply only to those corporations actually engaged in manufacturing in Pennsylvania.

432 Pa. at 484–485, 248 A.2d at 205 (emphasis in original). Because the taxpayer in *Weldon Pajamas* did not actually engage in manufacturing in Pennsylvania, this Court held that it was not entitled to the manufacturing exemption. *See also Commonwealth v. J.L. Mott Corporation*, 463 Pa. 539, 345 A.2d 650 (1975); *Commonwealth v. Semet–Solvay Co.*, 262 Pa. 234, 105 A. 92 (1918).

■ The manufacturing exemption is a locational incentive that "was created in order to establish a favorable climate in Pennsylvania for manufacturers and thus encourage the development of industry." *Commonwealth v. Deitch Company*, 449 Pa. 88, 94, 295 A.2d 834, 838 (1972). The manufacturing exemption does not apply to manufacturing generally. The Commonwealth Court thus correctly determined that PPG's headquarters' property and payroll are entitled to the manufacturing exemption only insofar as the headquarters' employees administer manufacturing plants actually located in the Commonwealth.

■ We now turn to PPG's claim that the manufacturing exemption to the capital stock tax violates the Commerce Clause. Our standard of review in examining whether a taxation provision is unconstitutional is whether the statute clearly, palpably and plainly violates the Constitution. *Leonard v. Thornburgh*, 507 Pa. 317, 489 A.2d 1349 (1985).

■ For state taxation to survive Commerce Clause scrutiny, it must satisfy the four-prong test established in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Under *Complete Auto*, a state tax will not survive a Commerce Clause challenge unless the tax: (1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State.

*Id.* at 279, 97 S.Ct. 1076. PPG's sole argument is that the manufacturing exemption discriminates against interstate commerce. The term " 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Oregon,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

In support of its argument, PPG relies chiefly on the United States Supreme Court's decisions in *Westinghouse Electric Corp. v. Tully,* 466 U.S. 388, 104 S.Ct. 1856, 80 L.Ed.2d 388 (1984), and *Boston Stock Exchange v. State Tax Commission,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). Although neither of these cases involved a taxing scheme deliberately designed to encourage business location or expansion within a state, the central meaning of discrimination as a standard for adjudicating the constitutionality of a state tax measure emanates from these decisions.

*Boston Stock Exchange* involved an amendment to New York's securities transfer tax that reduced the tax burden on securities transfers if the transfers were made on a New York exchange:

> Prior to the 1968 amendment, the New York transfer tax was neutral as to in-state and out-of-state sales. An in-state sale transfer or delivery of securities triggered the tax and the burden fell equally on all transactions regardless of the situs of sale. Thus, the choice of an exchange for the sale of securities that would be transferred or delivered in New York was not influenced by the transfer tax; wherever the sale was made, tax liability would arise. The flow of interstate commerce in securities was channeled neither into nor out of New York by the state tax.
>
>     \* \* \*
>
> After the amendment took effect, a nonresident contemplating the sale of securities that would be delivered or transferred in New York faced two possible tax burdens. If he elected to sell on an out-of-state exchange, the higher rates

of § 270 applied without limitation on the total tax liability. Similarly, residents engaging in large block transactions on the New York exchanges were subject to a maximum tax levy of $350; but if they sold out-of-state, their tax bill would be limited only by the number of shares sold.

429 U.S. at 330–331, 97 S.Ct. 599. The Court found the discriminatory character was demonstrated by the fact that "the amendment forecloses tax-neutral decisions." *Id.* at 332, 97 S.Ct. 599. The Court stated:

> New York's discriminatory treatment of out-of-state sales is made possible only because some other taxable event (transfer, delivery, or agreement to sell) takes place in the State. Thus, the State is using its power to tax an in-state operation as a means of "requiring [other] business operations to be performed in the home State." As a consequence, the flow of securities sales is diverted from the most economically efficient channels and directed to New York. This diversion of interstate commerce and diminution of free competition in securities sales are wholly inconsistent with free trade and the purposes of the Commerce Clause.

*Id.* at 336, 97 S.Ct. 599.

Unlike the transactional tax scheme rejected in *Boston Stock Exchange*, *Westinghouse Electric* concerned a New York franchise tax provision allowing businesses that conducted their export business through a domestic international sales corporation (DISC) an income tax credit based on the portion of the DISC's exports shipped from a New York site. This income tax credit was designed to increase as New York's share of the DISC's total export activity increased and to decrease as other states' shares also increased. The Court unanimously concluded that the tax credit violated the Commerce Clause:

> The State has violated the prohibition in *Boston Stock Exchange* against using discriminatory state taxes to burden commerce in other States in an attempt to induce

"business operations to be performed in the home State that could more efficiently be performed elsewhere."

466 U.S. at 406, 104 S.Ct. 1856. The Court further stated:

> As in *Boston Stock Exchange,* we do not "hold that a State may not compete with other States for a share of interstate commerce; such competition lies at the heart of a free trade policy. We hold only that in the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State."

*Id.* at 406 n. 4, 104 S.Ct. 1856 (citations omitted).

PPG argues that the anti-discrimination principles underlying the *Boston Stock Exchange* and *Westinghouse Electric* decisions are equally applicable to commerce clause analysis of locational incentives such as the manufacturing exemption. In *Boston Stock Exchange* and *Westinghouse Electric,* the discriminatory tax measures at issue resulted in differential tax liability dependent upon whether the taxpayer engaged in instate or out-of-state commercial activities. PPG contends that the same is true of the manufacturing exemption to Pennsylvania's capital stock tax.

In support of this contention, PPG provides the following compelling example:

> [The Pennsylvania capital stock] tax fluctuates based on where—in Pennsylvania or out-of-state—PPG decides to locate, expand, or reduce its manufacturing plant payroll and/or property. If PPG expands a manufacturing plant in Ohio, the Pennsylvania capital stock tax on its corporate headquarters will increase. If, however, PPG expands a manufacturing plant in Pennsylvania, PPG's Pennsylvania capital stock tax on its corporate headquarters will decrease. Similarly, PPG's capital stock tax will fluctuate as it closes an out-of-state plant (decreased tax) or an in-state plant (increased tax).[8] Necessarily, by use of the Department's sub-apportionment methodology, PPG's headquarters' tax increases as PPG expands out-of-state activity which lacks tax nexus to Pennsylvania, even if there is no equivalent increase in headquarters' payroll.

n8 As simple an action as hiring or raising the salary of a single employee at an out-of-state manufacturing plant while not taking comparable action at an in-state plant decreases the exemption.

(Brief for Appellant at 20–21). In his dissent to the Commonwealth Court's *en banc* opinion, Judge McGinley agreed with PPG and adopted the following analysis:

> If a multi-state corporation expands its manufacturing in another state, one of the direct costs of the expansion is an increase in the capital stock tax. Conversely, if a multi-state corporation expands in Pennsylvania the capital stock tax decreases. Not only does the manufacturing exemption provide a positive incentive for multi-state corporations to increase manufacturing in Pennsylvania, but it penalizes corporations for manufacturing in other states.

681 A.2d at 836. The manufacturing exemption thus penalizes out-of-state commercial activity by raising in-state tax liability when in-state commercial activity remains constant but out-of-state commercial activity increases.

PPG further asserts that the United States Supreme Court's decision in *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), supports the conclusion that the manufacturing exemption violates the Commerce Clause. In *Fulton*, the Court was faced with a challenge to North Carolina's "intangibles tax" on the fair market value of shares of stock owned by North Carolina residents. Residents were entitled to calculate their tax liability by taking a "taxable percentage deduction" equal to the fraction of the issuing corporation's income subject to tax in North Carolina:

> [A] corporation doing all of its business within the State would pay corporate income tax on 100% of its income, and the taxable percentage deduction allowed to resident owners of that corporation's stock under the intangibles tax would likewise be 100%. Stock in a corporation doing no business in North Carolina, on the other hand, would be taxable on 100% of its value.

516 U.S. at 328, 116 S.Ct. 848. Finding that the intangibles tax facially discriminated against interstate commerce, a unanimous Court stated that "a regime that taxes stock only to the degree that its issuing corporation participates in interstate commerce favors domestic corporations over their foreign competitors in raising capital among North Carolina residents." *Id.* at 333, 116 S.Ct. 848.

PPG contends that like the intangibles tax in *Fulton,* the manufacturing exemption to Pennsylvania's capital stock tax discriminates against interstate commerce. The "taxable percentage deduction" in *Fulton* was calculated by "applying a corporate income tax apportionment formula averaging the portion of the issuing corporation's sales, payroll, and property located in the State." *Id.* at 328, 116 S.Ct. 848. Similarly, Pennsylvania's manufacturing exemption is calculated using "three factor apportionment," which, like the "taxable percentage deduction" in *Fulton,* is measured by and inversely proportional to the extent of out-of-state activity. By using "three factor apportionment" to calculate an exemption instead of a tax, the capital stock tax is measured by the extent of out-of-state activity. In *Fulton,* the United States Supreme Court unanimously invalidated North Carolina's intangibles tax on precisely the same basis.

██ Nevertheless, the Commonwealth continues to assert that the manufacturing exemption does not discriminate against interstate commerce. The Commonwealth argues strenuously that the manufacturing exemption does not even implicate interstate commerce concerns because it does not involve a "transaction or incident" that "crosses state lines," citing *Armco Inc. v. Hardesty,* 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984). The Commonwealth's reliance on *Armco* for such a requirement is misplaced. As stated by the Court in *Armco,* "[o]ne aspect of [the Commerce Clause's protection of free trade among the states] is that a state 'may not discriminate between transactions on the basis of some interstate element.' ... That is, a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." 467 U.S. at 642, 104 S.Ct.

2620. The application of Commerce Clause analysis is not limited to those cases involving a "transaction or incident" that "crosses state lines;" such cases are merely among the types of cases which implicate the Commerce Clause. Moreover, such an interpretation conflicts with the focus of Commerce Clause analysis of state tax provisions; that is, the "practical effect" of the challenged tax measure. *See, e.g., Complete Auto,* 430 U.S. at 279, 97 S.Ct. 1076.

■ By employing the manufacturing exemption to the capital stock tax as a means of inducing other business operations, i.e., manufacturing, to be performed in Pennsylvania, Section 602 unconstitutionally forecloses "tax neutral decisions" and affords preferential treatment to corporations that engage in manufacturing activities in the Commonwealth. This is the exact type of "economic Balkanization"[8] the Commerce Clause protects against.

■ We thus agree with PPG that the manufacturing exemption to Pennsylvania's capital stock tax facially discriminates against interstate commerce.[9] The constitutional inquiry does not end here however. As this Court stated in *Annenberg v. Commonwealth,* 1998 Pa. Lexis 652 (1998):

> [O]nce a determination has been made that a statute is facially discriminatory, the burden then shifts to the state to establish that the statute "advances a legitimate local purpose that cannot be adequately served by reasonably non-discriminatory alternatives." *New Energy Co [of Indiana v. Limbach*], 486 U.S. at 278, 108 S.Ct. at 1810, 100 L.Ed.2d 302 at 311. In the language of *Fulton,* there are
>
> > three conditions necessary for a valid compensatory tax. First, a State must, as a threshold matter, identify . . .

8. *See Hughes v. Oklahoma,* 441 U.S. 322, 325, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).

9. In making this determination, this Court is ever mindful of the manufacturing exemption's long history and the potential chilling effect that an ultimate decision holding the manufacturing exemption unconstitutional would have on manufacturing in the Commonwealth. However, with regard to analysis of state tax provisions in relation to the Commerce Clause of the United States Constitution, we are constrained to adhere to the precedents of the United States Supreme Court.

the intrastate tax burden for which the State is attempting to compensate. Second, the tax on interstate commerce must be shown roughly to approximate—but not exceed—the amount of the tax on intrastate commerce. Finally, the events on which the interstate and intrastate taxes are imposed may be substantially equivalent; that is, they must be sufficiently similar in substance to serve as mutually exclusive proxies for each other.

516 U.S. at 332–333, 116 S.Ct. at 854–855, 133 L.Ed.2d at 806 (citations and internal quotation marks omitted).

It is apparent that these inquiries contain a significant factual component and can be properly addressed only in the context of a hearing at which the parties may introduce evidence to support their respective positions.

1998 Pa. Lexis 652 at *7. Consistent with the procedure established by this Court in *Annenberg,* and pursuant to the attached order, the decision of the Commonwealth Court is reversed and the matter is remanded to the Commonwealth Court for a hearing on the issues related to whether Section 602 is a compensatory tax, and therefore constitutional.[10]

## *ORDER*

PER CURIAM.

This Court holds that 72 P.S. § 7602 facially discriminates against interstate commerce. The order of the Commonwealth Court is reversed.

---

**10.** Curiously, in its reply brief to this Court, PPG "emphasizes that it has never sought to have the [manufacturing] exemption itself declared unconstitutional." (Reply Brief for Appellant at 13). We find this assertion disingenuous. PPG, throughout these proceedings, has challenged the manufacturing exemption on constitutional grounds, claiming a violation of the Commerce Clause. PPG cannot now, at this advanced stage of the proceedings, retract its constitutional "attack [on] the goose that has been laying golden eggs for it." *See* Peter D. Enrich, Saving the States from Themselves: Commerce Clause Constraints on State Tax Incentives for Business, 110 Harv. L.Rev. 377, 411 (1996) (positing that businesses in a position to challenge locational incentives might question the strategic wisdom of pursuing a course of action that could deprive them of the tax breaks locational incentives provide).

Furthermore, it is hereby ORDERED that this matter be remanded to the Commonwealth Court, where the President Judge shall assign a judge to hold a hearing on the following issues:

1. Whether 72 P.S. § 7602 is a "compensatory tax" as defined by *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996).

2. If it is determined that 72 P.S. § 7602 is not a "compensatory tax," and that 72 P.S. § 7602 is therefore unconstitutional as it violates the Commerce Clause of the United States Constitution, what is the appropriate remedy.

We direct that within one hundred eighty (180) days of this order, the Commonwealth Court shall transmit to this Court findings of fact and conclusions of law on the above listed issues. Upon the filing of the findings of fact and the conclusions of law with this Court, the Prothonotary of the Supreme Court shall set a briefing schedule for the filing of briefs with this Court.

Jurisdiction is retained.