ASSOCIATED INDUSTRIES OF
MISSOURI, and Alumax Foils,
Inc., Appellants,

v.

DIRECTOR OF REVENUE and Delong's
Incorporated, et al., Respondents.

No. 75089.

Supreme Court of Missouri,
En Banc.

June 29, 1993.

Juan D. Keller, St. Louis, for appellants.

William L. Webster, Atty. Gen., Curtis F. Thompson, Asst. Atty. Gen., Alex Bartlett, Jefferson City, for respondents.

PRICE, Judge.

Appellants challenge the constitutionality of § 144.748, RSMo.Supp.1991.[1] The statute imposes a flat 1.5 percent use tax for the privilege of storing, using or consuming tangible personal property in Missouri that was purchased outside the state. Appellants seek a declaration that the tax violates the commerce, due process, and equal protection clauses of the United States Constitution and the due process, equal protection and uniformity clauses of the Missouri Constitution and an injunction permanently enjoining enforcement of the statute. The trial court denied both declaratory and injunctive relief. We have exclusive appellate jurisdiction under article V, § 3 of the Missouri Constitution and affirm the decision of the trial court.

## I

Appellant Associated Industries of Missouri ("AIM") is a not-for-profit corporation comprised of persons, firms, partnerships and corporations engaged in business or industry in Missouri. AIM's members pay Missouri sales and use taxes on purchases of tangible personal property purchased inside and outside of the state.

Appellant Alumax Foils, Inc., ("Alumax") is a Delaware corporation headquartered in St. Louis, Missouri. It is a member of AIM. Alumax manufactures and sells foil products inside and outside of Missouri. Some of its purchases in Missouri are subject to local sales taxes at rates less than 1.5 percent.

Respondent Raymond T. Wagner, Jr., was the duly appointed and qualified director of revenue, who in such capacity was charged with administering § 144.748.

Respondent intervenors include: Delong's, Inc., a steel fabricating company located in Jefferson City; the City of Blue Springs, a municipality located in Jackson County; Gary Markenson, a taxpayer residing in Jefferson City; the Missouri Association of Counties, a not-for-profit corporation representing the interests of 112 Missouri counties; the Missouri Municipal League, a benevolent corporation representing the interests of 540 municipalities; and, the Associated General Contractors of Missouri, a benevolent corporation whose members include contractors and others with similar business interests. They all allege that they will suffer harm should appellants prevail.

■ Respondent intervenors argue that appellants lack standing to challenge the constitutionality of § 144.748. The parties, however, have stipulated that appellants are subject to payment of the use tax under § 144.748 and that the Appellants pay sales taxes in geographical areas where the aggregate sales tax is less than the aggregate use tax. Accordingly, § 144.748 affects appellants' business interests as they choose between in-state and out-of-state purchase of goods, sometimes with differing sales and use tax burdens. This is sufficient to confer standing on appellants, Alumax and AIM.[2]

## II

Before considering the constitutionality of § 144.748, it is necessary to set forth the comprehensive sales and use tax scheme in Missouri. Generally, a sales tax is imposed upon the sale of an item of tangible personal property within the state. A use tax is a one-time tax attached to the use, consumption or storage of an item of tangible personal property, otherwise exempt from sales tax because it was purchased from a seller outside of the state. Use taxes are often referred to as "complementary" to sales taxes. In addition to raising revenue, use taxes attempt to equalize the competi-

---

**1.** With the exception of this provision, all statutory references are to RSMo 1986, unless otherwise indicated.

**2.** In *Mo. Outdoor Adv. v. Hwys. & Transp. Comn.*, 826 S.W.2d 342 (Mo. banc 1992), we held that associations have standing to present the common interests of their members.

tive position of intrastate and interstate commerce by assuring that Missouri residents who purchase from either source bear equivalent tax burdens.

Section 144.020 imposes a statewide sales tax of 4.225 percent on the sales price of tangible personal property sold in Missouri. Section 144.610 imposes a statewide use tax of 4.225 percent on the sales price of tangible personal property sold outside of Missouri but stored, used, or consumed in Missouri.

Other provisions authorize, but do not require, county and municipal governments to impose various local sales taxes on the sale of tangible personal property sold within their jurisdiction. *See, e.g.*, §§ 66.-600 to 66.630, 67.500 to 67.545, 92.400 to 92.420, 94.500 to 94.510, 94.600 to 94.655, and 94.700 to 94.745. Prior to the enactment of § 144.748, these permissive sales tax statutes resulted in an aggregate sales tax rate higher than 4.225 percent in the vast majority of counties and municipalities in the state, while the use tax on similar transactions made outside the state remained at 4.225 percent.

In response, the General Assembly enacted § 144.748, also known as the "additional use tax". The statute imposes an additional flat use tax at the rate of 1.5 percent on the sales price of tangible personal property purchased outside the state. While the tax is imposed and collected by the state, it is distributed back to the counties in accordance with a formula provided in the statute.

As a result of the flat use tax rate, the aggregate use tax imposed upon all interstate transactions is now 5.725 percent of the sales price. The aggregate sales tax rate on an identical intrastate transaction, however, may be higher or lower than 5.725 percent, depending upon the rate that each county and municipal government has imposed under the permissive sales tax provisions.

Generally, most taxable sales are subject to a higher aggregate sales tax rate than the aggregate use tax rate. The following cities, however, are among those areas where the aggregate sales tax rate falls below 5.725 percent: Dexter in Stoddard County; Clifton Hill in Randolph County; New Cambria in Macon County; Napoleon in Lafayette County; Bixby and Glover, both in Iron County; Brandsville in Howell County; Stanberry in Gentry County; Kennett and Malden, both in Dunklin County; Winston in Daviess County; Gordonville in Cape Girardeau County; Monett in Barry County; and Farber in Audrain County. Consequently, consumers such as appellants who purchase, for example, a copy machine in Dexter, Missouri, pay less in sales taxes than they would have paid in use taxes had they purchased the copy machine outside the state. It is this disparity that appellants contest.

In the case at bar, the parties have stipulated to figures that reflect taxable sales made in Missouri in the calendar year of 1990. Respondents argue that based on these figures, had § 144.748 been enacted at that time, the use tax would have been less burdensome on interstate commerce than the complementary sales tax on intrastate sales when considered on a statewide basis. The record reveals that in 1990, the use tax would have imposed approximately $100,000,000 less in overall tax liability than would have been generated had the sales been made instate and subject to sales taxes. Based upon these stipulated facts, 93.14 percent of all taxable sales made in Missouri were subject to an aggregate sales tax rate of 5.725 percent or higher. Of those sales, 55.32 percent were subject to an aggregate sales tax rate in excess of 5.725 percent, with some aggregate sales tax rates as high as 7.5 percent. However, 6.86 percent of the taxable intrastate sales were subject to a sales tax rate less than 5.725 percent, which would have been the statewide aggregate use tax rate had § 144.748 been enacted.[3]

3. It is also possible to examine other comparisons. The number of counties and municipalities in which the aggregate use tax rate exceeds the aggregate sales tax rate is 841 out of 1,573, or approximately 53.5 percent. Also, 26.5 percent of Missouri's population live in counties where the use tax rate exceeds the sales tax rate. Neither of these percentages make adjustment

Thus, the core issue before the Court is whether a state use tax may impose a greater burden than the various sales taxes in specific localities, if on a statewide basis the use tax imposes a lesser overall burden than do all the various sales taxes. We hold that it may where, as here, the state displayed no purpose to discriminate against interstate commerce and has substantially avoided doing so.[4]

### III

■ Article I, § 8, cl. 3, of the United States Constitution expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States." Although the clause is an express grant of power, it also has been understood to imply a "negative sweep" that limits the states' power to interfere with interstate commerce. *Quill Corp. v. North Dakota,* — U.S. —, —, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91, 104 (1992). This 'negative' aspect of the commerce clause has long been held to prohibit states from discriminating against interstate commerce but does not necessarily require "identical treatment of all taxpayers engaged in such commerce." *Tatarowicz and Mims–Velarde, An Analytical Approach to State Tax Discrimination Under the Commerce Clause,* 39 Vand.L.Rev. 879, 925 (1986).

The United States Supreme Court has oscillated in its interpretation on the commerce clause over the years, particularly as that clause concerns limitations on state taxation powers. *Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 420, 66 S.Ct. 1142, 1150, 90 L.Ed. 1342 (1946); *see*

*Quill,* — U.S. at —, 112 S.Ct. at 1911, 119 L.Ed.2d at 104. In the earliest decisions, the Supreme Court declared that "no State has the right to lay a tax on interstate commerce in any form." *Leloup v. Port of Mobile,* 127 U.S. 640, 648, 8 S.Ct. 1380, 1384, 32 L.Ed. 311 (1888); *see also Brown v. Maryland,* 12 Wheat 419, 6 L.Ed. 678 (1827). Later cases interpreted the commerce clause less stringently by distinguishing between direct and indirect burdens on interstate commerce. Direct burdens were prohibited while indirect burdens were generally permitted. *Quill,* — U.S. —, —, 112 S.Ct. at 1911, 119 L.Ed.2d at 104 *citing Sanford v. Poe,* 69 F. 546 (6th Cir.1895), *aff'd sub nom Adams Express Co. v. Ohio State Auditor,* 165 U.S. 194, 220, 17 S.Ct. 305, 308, 41 L.Ed. 683 (1897). The wavering doctrinal lines of the Court's decisions reflect the tension between two competing concepts: the view that interstate commerce enjoys a "free trade" immunity from state taxation; and the view that businesses engaged in interstate commerce may be required to pay their own way. *Goldberg v. Sweet,* 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989).[5]

The currently accepted commerce clause approach is articulated in *Complete Auto Transit, Inc., v. Brady.* There, the Court attempted to reconcile the concept of unrestricted access to the national market with each state's authority to collect its fair share of revenues from interstate commercial activity. 430 U.S. 274, 285, 97 S.Ct. 1076, 1082, 51 L.Ed.2d 326 (1977). *Complete Auto* emphasizes looking past "the formal language of the tax statute [to] its

---

for the fact that certain counties that have sales tax rates lower than the use tax rates contain municipalities with sales tax rates that are higher than the use tax rates. Hence, these percentages are most likely overstated for use here. At any rate, however, such comparisons do not reflect commercial activity and the impact upon that activity of sales or use tax burdens. Accordingly, the most helpful focus in an examination of whether discrimination exists against commerce is the burden on actual sales.

**4.** Our decision is limited to the facts in this record. Sales tax rates may change or purchasing patterns may vary. Whether the statute's application to future situations remains within

constitutional bounds must be determined in accordance with facts as they occur.

**5.** The murky nature of the precedents on this issue was noted by this commonly cited satirical restatement of the law of interstate commerce:

Although the power of the Federal Government over interstate commerce is plenary, the states may regulate commerce some, but not too much. If a state attempts to regulate commerce too much such regulation will be unconstitutional. Caveat: This Restatement is not intended to express any opinion as to how much regulation is too much.

W. Lockhart, Y. Kamisar & J. Choper, Constitutional Law 349 (4th ed. 1975).

practical effect." *Id.* at 279, 97 S.Ct. at 1079. Under the *Complete Auto* analysis, a state tax on interstate commerce will be sustained against a commerce clause challenge so long as the tax "[1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." *Id.* 430. U.S. at 279, 97 S.Ct. at 1079. Our review of § 144.748 focuses on the third prong of the *Complete Auto* test: Does the statute discriminate against interstate commerce?

The issue of whether complementary use and sales tax schemes are discriminatory under the commerce clause has been the subject of a substantial amount of litigation. When states first began to adopt sales taxes, they feared that local merchants would lose business when prospective buyers purchased outside the state to avoid local sales tax liability. States also feared the loss of revenue they would incur as a result of the diversion to nontax sellers from other states. *Hellerstein, Complementary Taxes as a Defense to Unconstitutional Tax Discrimination*, 39 Tax Law. 405, 407 (1986). Complementary use taxes developed in response to concerns about the troublesome gap created by the adoption of sales taxes.

When considered in isolation, use taxes are discriminatory, as they are intended to apply only to goods acquired out of state. *Halliburton Oil Well Co. v. Reily*, 373 U.S. 64, 69, 83 S.Ct. 1201, 1203, 10 L.Ed.2d 202 (1963). Because they are usually paired with corresponding sales taxes, however, the Supreme Court has upheld such tax schemes. The Court has found that in the context of the overall tax structure such statutes may properly impose on the out-of-state purchase of goods an equivalent burden to that imposed on an in-state purchase. *Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937).

At issue in *Henneford* was a Washington use tax imposed upon the "privilege of using within [the taxing] state any article of tangible personal property" that was not otherwise subject to a tax equal to or greater than the use tax. 300 U.S. at 580, 57 S.Ct. at 525. The Court stated:

> Equality is the theme that runs through all the sections of the statute ... When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed. Equality exists when the chattel subjected to the use tax is bought in another state and then carried into [the state]. It exists when the imported chattel is shipped from the state of origin under an order received directly from the state of destination. In each situation, the burden borne by the owner is balanced by an equal burden where the sale is strictly local.

*Id.* at 583–84, 57 S.Ct. at 527. The critical question, the Court explained, was not whether a distinction existed "in form", but whether "there was any substantial discrimination in fact." *Id.* at 585, 57 S.Ct. at 528, *quoting Gregg Dyeing Co. v. Query*, 286 U.S. 472, 52 S.Ct. 631, 76 L.Ed. 1232 (1932).

The tax scheme in the instant case is slightly different from the typical complementary sales/use tax scheme sanctioned in *Henneford*. Here, we have a use tax that treats interstate commerce more favorably than intrastate commerce on an overall basis. Because local sales taxes are permissive in Missouri, however, the comparison between the use and sales tax varies from locality to locality. As previously stated, had § 144.748 been enacted in 1990, this would have resulted in 55.32% of instate sales being subject to a higher sales tax rate, 36.82% of instate sales being subject to an equal sales tax rate, but 6.86% of instate sales being subject to a lower sales tax rate than the use tax rate.

### IV

The standard to be applied for determining whether discrimination exists, the third prong of the *Complete Auto* test, has not

been stated with consistency. It is difficult from reading the various decisions to determine whether their outcomes are the result of differing factual contexts or shifting ideology. Generally, *Halliburton*, 373 U.S. 64, 70–71, 83 S.Ct. 1201, 1204, 10 L.Ed.2d 202 is the primary case implying a rather rigid dollar-for-dollar equivalence between intrastate and interstate taxation. *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 52 S.Ct. 631, 76 L.Ed. 1232 (1932), and *General American Tank Car Corp. v. Day*, 270 U.S. 367, 46 S.Ct. 234, 70 L.Ed. 635 (1925), however, are the leading cases appearing to allow for a more practical approach that does not require "mathematical exactness." A brief review of these and other representative cases is in order.

## A.

In *Halliburton*, the Court considered a Louisiana use tax imposed on specialized equipment purchased and assembled outside the state. Although the sales and use tax rates were identical, they were applied to different tax bases: labor and shop overhead costs were excluded from the sales tax base but were included in the use tax base. The Court found that including these costs in the use tax base had the discriminatory effect of imposing a greater tax on goods manufactured outside of Louisiana than on goods manufactured within the state. The Court declared the tax unconstitutional and stated:

> [E]quality for the purposes of competition and the flow of commerce is measured in dollars and cents, not legal abstractions. In this case, the "incidental discrepancy"—the labor and shop overhead for the units in dispute—amounts to $1,547,109.70. The use tax rate in Louisiana is 2% and has risen in some

States to 4%. The resulting tax inequality is clearly substantial.

*Halliburton*, 373 U.S. at 70–1, 83 S.Ct. at 1204–5.[6]

Some state courts have used *Halliburton* to strike their own use tax provisions. The Supreme Court of Oklahoma relied on *Halliburton* when it struck down a use tax similar to the use tax at issue here. The use tax rate in *Phillips v. Oklahoma Tax Comm'n*, 577 P.2d 1278 (Okl.1978), was increased from 2 percent to 4 percent of the sales price of tangible personal property used or consumed in Oklahoma. The statewide sales tax remained at 2 percent.

The state argued that the inequality was rectified by the existence of optional and non-uniform municipal sales taxes. The Oklahoma Court rejected this argument outright, citing *Halliburton* as requiring that *"equality* for the purposes of competition and the flow of commerce *is measured in dollars and cents not legal abstractions." Id.* at 1284. It then found that the $12,000,000 that would be raised by the increased use tax was "clearly substantial" and thereby discriminatory. *Id.* at 1284.

The Supreme Court of Ohio also relied on *Halliburton* to strike an Ohio use tax statute. In *American Modulars Corp. v. Lindley*, 54 Ohio St.2d 273, 376 N.E.2d 575, 576 (1978), individual counties were authorized, but not required, to levy an additional one-half percent sales and use tax on property purchased or used within their boundaries.[7] The ultimate result of the Ohio tax scheme was that all property used or purchased in any particular county would be taxed at an equivalent rate. However, a purchaser could choose to buy an item in another county without the per-

---

**6.** See also *Westinghouse Electric Corp. v. Tully*, 466 U.S. 388, 104 S.Ct. 1856, 80 L.Ed.2d 388 (1984) (New York tax credit for products shipped from New York held unconstitutionally discriminatory against interstate commerce); *Maryland v. Louisiana*, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) (Louisiana "first use tax" imposed on imported natural gas to "compensate" for Louisiana severance tax held unconstitutional because the tax was not based on complementary events and because certain exemptions and credits favored local interests);

*Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977) (New York stock-transfer tax held unconstitutional because it discriminated against interstate commerce by reducing taxes on in-state transfers but not on out-of-state transfers.)

**7.** In addition to the permissive county sales and use taxes, the state imposed a four percent tax on the sale or use of tangible personal property purchased or consumed in Ohio.

missive tax, thereby obtaining an intrastate tax advantage when compared to an out-state purchase delivered to the taxpayer's home county.

The Ohio Court found that this result provided a direct commercial advantage to local businesses that would impede the free flow of trade between the states. *Id.* at 577, *citing Freeman v. Hewit,* 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946). It concluded that the statute discriminated "against out-of-state acquisitions as invidiously as it would if it subjected those purchases to an unfavorable tax basis." *Id., citing Halliburton,* 373 U.S. at 70, 83 S.Ct. at 1204.

The California Supreme Court also cited *Halliburton* in *Woosley v. State,* 3 Cal.4th 758, 13 Cal.Rptr.2d 30, 838 P.2d 758 (1992), when it struck down a use tax. The use tax in *Woosley* imposed a higher tax on vehicles originally sold outside California than the tax charged on similar vehicles first sold within the state. Although the tax rate was the same for both, the tax bases differed. The tax base for vehicles originally purchased outside the state was determined by the actual purchase price. The tax base for vehicles purchased within California was determined by the manufacturer's suggested base price.

The Court found that the practice resulted in the imposition of significantly higher license fees for vehicles purchased outside the state than for those first sold in California. The discrepancy was caused, in part, by the inclusion of factory-installed accessories and optional equipment in the actual purchase price, which were excluded from the suggested base price for vehicles originally purchased in California. *Id.,* 13 Cal.Rptr.2d at 33–35, 838 P.2d at 762–63.

The only justification offered by the state for the discrimination was administrative convenience. The court found that even if such concern could, under some circumstances, justify an obstruction to interstate commerce, the showing made by the state was insufficient because the state had previously utilized nondiscriminatory alternatives. *Id.,* 13 Cal.Rptr.2d at 35, 838 P.2d at 771.

*B.*

Another line of authority, however, permits complementary state taxes on interstate commerce "in lieu of" local taxes even though in some instances they may burden interstate commerce more heavily than intrastate commerce. *General American,* 270 U.S. 367, 46 S.Ct. 234; *Gregg Dyeing Co.,* 286 U.S. 472, 52 S.Ct. 631, 76 L.Ed. 1232 (1932); *Railway Express Agency, Inc. v. Virginia,* 358 U.S. 434, 79 S.Ct. 411, 3 L.Ed.2d 450 (1958); *Illinois Cent. R.R. v. Minnesota,* 309 U.S. 157, 60 S.Ct. 419, 84 L.Ed. 670 (1940); *Department of Revenue v. Warren Petroleum Corp.,* 2 Ill.2d 483, 119 N.E.2d 215 (1954). These cases give the commerce clause a more flexible interpretation that allows for a more practical standard.

*General American* is the seminal case of the "in lieu of" doctrine. There, the Supreme Court sustained a tax on the rolling stock of out-of-state firms even though the parties stipulated that there was a disparity between the rate the out-of-state firms were charged and the rate an instate firm would have had to pay. *Id.* 270 U.S. at 374, 46 S.Ct. at 236. The out-of-state firms were subject to a flat rate of 25 mills per dollar of assessed value statewide, while instate firms were subject to higher or lower rates in various parishes. *Id.*

Despite the fact that local taxes in some parishes were below the flat tax rate imposed on interstate commerce, the Court sustained the tax because the Appellants failed to show that the flat rate of 25 mills fell below the general average of taxes on residents collectively statewide. *Id.* The Court stated:

"[W]here the taxing statute which is in lieu of a local tax assessed on residents discloses no purpose to discriminate against nonresident taxpayers, and in substance does not do so, it is not invalid merely because equality in its operation as compared with local taxation has not been attained with mathematical exactness. In determining whether there is a denial of equal protection of the laws by such taxation, we must look to the fair-

ness and reasonableness of its purpose and practical operation, rather than to minute differences between its application in practice and the application of the taxing statute or statutes to which it is complementary." *Id.* 270 U.S. at 373, 46 S.Ct. at 236.

Specifically, appellants had argued that the average local tax statewide was at the rate of twenty-one mills, four mills less than the interstate tax at issue. Although noting that this had not been proven, the Court went on to state that it would not hold that:

A four mills variation in one year not shown to be a necessary or continuing result of the scheme of taxation adopted, would be an unconstitutional discrimination; for in such a scheme of complementary tax statutes, however fairly devised, it would be impossible to provide in advance against occasional inequalities as great as that here complained of. *Id.* 270 U.S. at 373–374, 46 S.Ct. at 235–236.

In *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 52 S.Ct. 631, 76 L.Ed. 1232 (1932), the Court followed the same theme expressed in *General American Tank*, stating:

We regard the substance rather than the form, and the controlling test is formed in the operation and effect of the statute as applied and enforced by the state. Id. 286 U.S. at 476, 52 S.Ct. at 633.

The Court further noted that:

Discrimination like interstate commerce itself is a practical conception. We must deal in this matter, as in others, with substantial distinction, and real injury. *Id.* 286 U.S. at 481, 52 S.Ct. at 635.

The more practical approach indicated in *General American* and *Gregg Dyeing Co.* also has been relied upon by state courts in upholding use taxes where the overall tax scheme was deemed fair but worked some inequalities in certain circumstances. For example, in *Lane Construction Corp. v. Comptroller of the Treasury*, 228 Md. 90, 178 A.2d 904 (Md.1962), the Court of Appeals of Maryland sustained a use tax that used a different tax base than the base used in determining the sales tax. Originally both sales and use taxes were based on the actual purchase price. Thus, goods

purchased outside the state were taxed on their purchase price no matter how long after the purchase they were first used, stored or consumed in Maryland. *Id.*, 178 A.2d at 905.

In order to soften the impact of the use tax in situations where goods first became taxable in Maryland after long use elsewhere, the legislature provided that in computing the assessable basis, 10 percent of the purchase price be deducted for each full year of use outside the state. *Id.* at 905. Appellant argued that the formula imposed higher taxes on out-of-state goods.

The Court found:

The fact that, in a given circumstance, the tax produced by the statutory formula of the value of an item imported, and the amount at which a comparable item could then be bought secondhand in Maryland—if one were available—[did] not coincide precisely, [did] not of itself make the tax unconstitutional."

The Court upheld the tax and explained:

The Supreme Court in viewing the practical operation of use taxes attacked as in violation of the commerce clause, has looked to see if substantial discrimination against "foreigners" in plan or effect was present. [citations omitted]. The Court has not required that mathematical equality be given to out-of-state taxpayers or products, as long as such equality was reasonably attempted and somewhat closely achieved.

*Id.* at 907, *citing Pacific Tel. & Tel. Co. v. Gallagher*, 306 U.S. 182, 59 S.Ct. 396, 83 L.Ed. 595; *Southern Pac. Co. v. Galagher*, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586; *Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937); *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 52 S.Ct. 631, 76 L.Ed. 1232; *General American Tank Car Corp. v. Day*, 270 U.S. 367, 46 S.Ct. 234, 70 L.Ed. 635; *Hartman, State Taxation of Interstate Commerce*, p. 163.

The Supreme Court of Michigan also adopted this reasoning in rejecting a commerce clause challenge based upon sales and use tax disparities between vehicle

sales made for leasing intrastate and vehicle sales made for leasing interstate. *Don McCullagh, Inc. v. State*, 354 Mich. 413, 93 N.W.2d 252, 257 (1958) (appeal dismissed for lack of substantial federal question). The Court stated:

> [T]he Michigan legislature has acted accordingly to work out a fair and just system. Mechanically a perfect result may not be obtained in all instances. In the case at bar the amount of the sales tax paid by plaintiff exceeds what the use tax would have been had it been payable in Michigan. It is conceivable, however, that under the same sort of transaction as is here involved such condition might well be reversed. It is questionable if any tax law could be devised that would result in absolute equality under all circumstances.

Id. The Court then concluded that despite a few disparities, the tax was constitutional.

### V

In deciding the present case, we acknowledge that the Missouri scheme of state and local sales and use taxes does not provide for an equal burden in all situations. Approximately 6.86% of instate sales in 1990 were made in localities where the interstate use tax rate would have been higher than the intrastate sales tax rate had § 144.748 been in effect. An exacting application of the dicta contained in *Halliburton* and certain cases following it would require invalidating § 144.748. We do not, however, believe that this is the appropriate course to follow for a number of reasons.

*Halliburton, Maryland v. Louisiana, Westinghouse,* and *Boston Stock Exchange,* to some extent, can be distinguished. In each of these cases the taxes that were found unconstitutional imposed higher use taxes both on an individual basis and on an average statewide basis. In no case was the use tax ever less than the sales tax. Whether the discrimination against interstate commerce was small or

large in dollar amount, it was mandated in every transaction and unmitigated by the structure of the tax.[8]

In the present situation, this is not so. The use tax enacted by § 144.748 was calculated to produce a statewide result of a lesser burden on interstate commerce than exists for intrastate commerce. The stipulated facts indicate that for 1990, the use tax at issue would have resulted in approximately $100,000,000 less in overall tax liability than the corresponding sales taxes. When combined with the fact that 93.14% of the 1990 sales would have resulted in use taxes either at the same or at lower rates than the complementary sales tax, it is apparent that the tax was designed, and apparently works, to avoid discrimination on a statewide basis.

Moreover, the formalistic and exacting approach found in the dicta of the above cases seems to have been abandoned in the two most recent Supreme Court commerce clause decisions: *Trinova Corp. v. Michigan Treas. Dept.*, 498 U.S. 358, 111 S.Ct. 818, 112 L.Ed.2d 884 (1991), and *Quill Corp. v. North Dakota*, — U.S. —, —, 112 S.Ct. 1904, 1912, 119 L.Ed.2d 91 (1992). Citing *Mobil Oil Corp. v. Comm. of Taxes of Vt.*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980), which had recognized the "conflicting precedents" of the past, *Trinova* stated that:

> We seek to avoid formalism and to rely upon a "consistent rational method of inquiry [focusing on] the practical effect of a challenged tax."

Id. 498 U.S. at 373, 111 S.Ct. at 828, 112 L.Ed.2d at 904. In *Quill*, it was noted that "*Complete Auto* emphasized the importance of looking past 'the formal language of the tax statute [to] its practical effect.'" *Id.* — U.S. at —, 112 S.Ct. at 1912. Interestingly, Judge Benton has just commented on the new emphasis of "practical analysis" of "economic realities" in tax cases litigated under the commerce clause in his concurring opinion in *Bi Go Markets,*

---

8. The *Woosley* case also can be distinguished in this manner. *American Modulars* is suspect in its reliance on *Freeman,* which was overruled by *Complete Auto.* In *Phillips,* there was apparently no actual showing by the state that the tax was not discriminatory, although the state argued that in theory.

*Inc. and Wetterau, Inc. v. Morton*, 843 S.W.2d 916, 921 (Mo. banc 1992).

■ Under a "practical analysis" or "practical effect" test, § 144.748 passes scrutiny. In a state where a permissive system of local sales tax is allowed, the adoption of a statewide complementary use tax that results in a dollar for dollar match is most likely impossible. The Missouri legislature appears to have prudently set the use tax rate established by § 144.748 at a level that taxes most transactions at a lower rate than the sales tax rate. On a statewide basis "interstate commerce", as such, is not discriminated against. While in certain localities the use tax may exceed the sales tax, and while individual purchasers may chose to take advantage of these discrepancies on occasion, we must recall that while the commerce clause protects "interstate commerce", it does not require identical treatment of all taxpayers. In short, we do not find that appellants have established a discrimination that produces the type of "real injury" required by *Gregg Dyeing Co.* to invalidate a tax.

Appellants have suggested that the tax more properly could have been excepted from sales occurring in localities with rates of sales taxes below 1.5%. The state might also have required that the use tax mirror the permissive local sales tax. Neither option, however, would guarantee a better result. *American Modulars* illustrates that even these types of statutes are subject to criticism, as residents of one county may travel to another for tax advantage purchases. Depending upon the actual tax rates, demographics, and purchasing patterns, they might even result in greater discrepancies.

The legislature chose, instead, to enact a uniform but relatively low use tax rate that on a statewide basis compensates for any local discrepancy. So long as mathematical exactness is not required, this is a legislative and not a judicial area of discretion

into which we should neither speculate nor venture. As stated in *Trinova:*

> [w]e have always declined to undertake the essentially legislative task of establishing a single constitutionally mandated method of taxation.

*Id.* 498 U.S. at 387, 111 S.Ct. at 836, 112 L.Ed.2d at 913, citing *Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989).

■ We find that the tax scheme in the present case does not discriminate against interstate commerce in purpose or practical effect. It imposes a lesser tax burden on interstate commerce than it does on intrastate commerce and the local discrepancies do not rise to a level of quality or quantity that would demand a different result. *General American* [9] and the Supreme Court cases following it allow the states practical latitude in designing systems of complementary taxes. Section 144.748 is within these bounds.

*VI*

■ Appellants also maintain that § 144.748 violates the due process and equal protection clauses of the United States Constitution and the due process, equality and uniformity clauses of the Missouri Constitution. The due process clauses of the federal and state constitutions both require a minimum connection between the state and the person, property or transaction it seeks to tax, and that the income attributed to the state for tax purposes be rationally related to the values of the taxing case. *Quill*, —— U.S. at ——, 112 S.Ct. at 1909–10, 119 L.Ed.2d at 102; *Air Evac EMS, Inc. v. Director of Revenue*, 779 S.W.2d 573 (Mo.1989). The first and fourth prongs of the *Complete Auto* test satisfy this requirement, as they demand more than the due process requirement of "minimum contacts" for commerce clause purposes. *Trinova*, 498 U.S. at 373–74, 111 S.Ct. at 828–29, 112 L.Ed.2d at

---

**9.** To the extent *Halliburton, Maryland v. Louisiana, Westinghouse,* and *Boston Stock Exchange* are not distinguishable, they are nonetheless inconsistent with *General American.* In the face of inconsistent precedent from the United States Supreme Court, we will presume our

state statutes to be constitutional. Accordingly, § 144.748 will be "constitutional until the contrary is shown. Every indulgence must be made in favor of the legislature's handiwork." *Associated Industries v. State Tax Commission,* 722 S.W.2d 916, 918 (Mo. banc 1987).

904; *Quill*, —— U.S. at ——, 112 S.Ct. at 1913–14, 119 L.Ed.2d at 107 and n. 7. We find no basis in the record before us to support a challenge to § 144.748 on this basis.

■ Appellants' attack on § 144.748 under the equal protection clause of the federal constitution and the uniformity clause of the Missouri Constitution also fails. The equal protection clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Missouri's uniformity clause embodies a similar concept. It provides, in relevant part, "[t]axes may be levied and collected for public purposes only, and shall be uniform upon the same class or subclass of subjects within the territorial limits of the authority levying the the tax." Mo. Const. art. X, § 3.

■ The validity of a state tax statute under the equal protection clause is determined under the rational basis standard. *Exxon Corp. v. Eagerton*, 462 U.S. 176, 195–96, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983). Under this test, a statute will be sustained if the state legislature reasonably could have concluded that the challenged classification would promote a legitimate state purpose. *Id.* Missouri's uniformity clause uses a similar standard of reasonableness as described in *State v. Bates*, 224 S.W.2d 996, 1000 (Mo. banc 1949), where the Court stated:

> There is no precise yardstick as to reasonableness of classification and the rule of equality of necessity often tends to practical inequalities. Taxation is not an exact science and tax acts are not to be condemned merely because unavoidable inequalities may result. But the classification cannot be "palpably arbitrary."

In the present case, we find the state's choice of a uniform use tax rate is rationally related to its legitimate goals of avoiding discrimination against interstate commerce and trimming administrative costs;[10] and the classification of interstate and intra-

state commerce—the former being taxed on the purchase of a product and the latter being taxed on the use of a product in the state—is neither arbitrary or capricious and satisfies the equal protection clause and Missouri's uniformity clause. *Southwestern Bell Telephone v. Morris*, 345 S.W.2d 62 (Mo. banc 1961).

■ We also reject appellants' contentions that the enactment and implementation § 144.748 violate Mo. Const. art. X, §§ 1 and 10(a). Article X, § 1, authorizes the General Assembly to exercise taxing power for "state purposes." It also authorizes county and other political subdivisions to exercise taxing power under the power granted to them by the General Assembly for "county, municipal and other corporate purposes." Article X, § 10(a), specifically prohibits the General Assembly from imposing "taxes upon counties or other political subdivisions or upon the inhabitants or property thereof for municipal, county or other corporate purposes."

Appellants allege that § 144.748 violates these provisions because it is a state tax imposed for local purposes. While we agree that § 144.748 is a state tax, we do not agree that it was imposed for local purposes. Although local county and municipal taxes caused the initial imbalance between the sales and use taxes, § 144.748 was enacted for the "state purpose" of equalizing the burden between interstate commerce and intrastate commerce. The state has a legitimate interest in preventing the loss of business that Missouri merchants would suffer as prospective buyers purchased outside the state to avoid the additional local sales taxes and a legitimate interest in preventing the loss of revenue as a result of the diversion. *Trinova*, 498 U.S. at 385–86, 111 S.Ct. at 835–36, 112 L.Ed.2d at 912.

By finding § 144.748 is a tax imposed by the state for a "state purpose," appellants' argument that the statute violates art. X, § 22 becomes moot. This provision, one

10. Although administrative convenience is rarely, if ever a legitimate state purpose under the commerce clause, it does suffice for equal protection purposes. *General American*, 270 U.S. at 372, 46 S.Ct. at 235.

part of what is commonly referred to as the Hancock Amendment, requires voter approval before any tax may be levied by a county or other political subdivision. It states, in relevant part:

(a). Counties and other political subdivision are hereby prohibited from levying any tax, license or fees, not authorized by law, charter or self-enforcing provisions of the constitution when this section is adopted or from increasing the current levy of an existing tax, license or fees, above that current levy authorized by law or charter when this section is adopted without the approval of the required majority of the qualified voters of that county or other political subdivision voting thereon.

Because § 144.748 was enacted by the state for state purposes, Mo. Const. art. X, § 22, is wholly inapplicable.

■ Appellants make a similar argument that § 144.748 violates Mo. Const. art. X, § 16, which requires voter approval of a state tax when it causes the revenue limits specified in art. X, § 18, to be exceeded. Section 18 provides, in relevant part:

(a). There is hereby established a limit on the total amount of taxes which may be imposed by the general assembly in any fiscal year on the taxpayers of this state. Effective with the fiscal year 1981–1982, and for each fiscal year thereafter, the general assembly shall not impose taxes of any kind, which together with all other revenues of the state, federal funds excluded, exceed the revenue limit established in this section. The revenue limit shall be calculated for each fiscal year and shall be equal to the product of the ratio of total state revenues in fiscal year 1980–1981 divided by the personal income of Missouri in calender year 1979 multiplied by the personal income of Missouri in either the calendar year prior to the year in which appropriations for the fiscal year for which the calculation is being made, or the average of personal income of Missouri in the three previous calender years, whichever is greater.

We find the record totally void of any evidence supporting appellants' contention and thereby reject this argument.

■ Finally, appellants allege that § 144.748 violates Mo. Const. art. IV, § 28, which governs treasury withdrawals of state funds. Section 28 provides, in relevant part:

No money shall be withdrawn from the state treasury except by warrant drawn in accordance with an appropriation made by law, nor shall any obligation for that payment of money be incurred unless the commissioner of administration certifies it for payment and certifies that the expenditure is within the proper purpose as directed by the general assembly of the appropriation and that there is in the appropriation an unencumbered balance sufficient to pay it.

Appellants contend that § 144.748 violates this section of the constitution because the statute remits a certain portion of the collected tax to each locality without an appropriation by law.

We do not find Mo. Const. art. IV, § 28, applicable to the present case. It applies only to *state* funds deposited in the state treasury. Instead, we find that Mo. Const. art. IV, § 15, is the applicable provision. It provides:

The state treasurer shall be custodian of all state funds and funds received from the United States government. The department of revenue shall take custody of and invest nonstate funds as defined herein, and other moneys authorized to be held by the department of revenue ...

All revenue collected and moneys received by the department of revenue which are nonstate funds as defined herein shall be promptly credited to the fund provided by law for that type of money ... As used in this section, the term 'nonstate funds' shall include all taxes and fees imposed by political subdivisions and collected by the department of revenue; *all taxes which are imposed by the state, collected by the department of revenue and distributed by the department of revenue to political subdivisions;* and all other moneys which

are hereafter designated as 'nonstate funds' to be administered by the department of revenue.

The revenue collected by § 144.748 constitutes "nonstate funds." It is a tax imposed by the state, collected by the department of revenue, and distributed by the department of revenue to political subdivisions. Thus, there is no violation of Mo. Const. art. IV, § 28.

## VII

Accordingly, we hold that the uniform tax rate imposed by § 144.748 is not unconstitutional. The judgment of the trial court is affirmed.

COVINGTON, HOLSTEIN, THOMAS and LIMBAUGH, JJ., and AHRENS, Special Judge, concur.

ROBERTSON, C.J., dissents in separate opinion filed.

BENTON, J., not sitting.

ROBERTSON, Chief Justice, dissenting.

There is a single issue in this case: Whether a statewide use tax that places a higher tax burden on out-of-state purchases than is imposed by the sales tax on sales within Missouri violates the Commerce Clause of the United States Constitution. This question becomes all the more important when one considers that the use tax imposed by Missouri is higher in half of the taxing jurisdictions than is the sales tax. Elevating the cynic's conclusion about bureaucratic inefficiency to constitutional heights, the majority holds that the use tax scheme under scrutiny here is "close enough for government work." I respectfully dissent.

This case comes on cross-motions for summary judgment founded on the parties' stipulations of fact. Sales made in Missouri are subject to a statewide sales tax of 4.225%. Local taxing jurisdictions may also impose additional local sales taxes. The amount of local sales taxes imposed by local governments throughout Missouri is as high as an additional 3.5%, for a total tax of 7.725%.

Goods purchased outside of Missouri, but stored, used or consumed in Missouri are subject to a statewide use tax of 4.225%. The General Assembly, however, made no provision for offsetting local use taxes. As a result, instate sales were often subject to a higher overall sales tax than the use tax required for purchases of goods from other states. To remedy this competitive disadvantage for Missouri sellers, the legislature authorized an additional statewide use tax of 1.5%, making the aggregate use tax rate 5.725%, effective July 1, 1992.

The parties have stipulated that of the 1,573 taxing jurisdictions in Missouri, 841 (53.5%) of them have local sales taxes of less than 1.5%. Thus, in more than half of the taxing jurisdictions, the total use tax imposed on goods bought outside of Missouri is greater than the aggregate sales tax imposed on goods bought within the state. The State seeks to downplay this obvious disparity by arguing that those 841 taxing jurisdictions account for only 6.86% of the taxable sales in Missouri and only 2.76% of the sales taxes collected in the state.

The State's use of these figures is misleading and, I respectfully submit, the majority's reliance on these figures is incorrect.

This case is an attack on the *use* tax; it is, therefore, irrelevant what percent of *instate* sales are made in those jurisdictions with local sales tax rates below 1.5%. Even if a "de minimis" exception to the Commerce Clause exists, and it does not, the relevant figure is the percentage of the total *out-of-state* purchases that are made by residents of these jurisdictions. Only this number would provide a true reading as to the amount of interstate commerce actually affected by the disparity between the aggregate use tax and the aggregate sales tax in more than half the state.

Unfortunately, the record provides no basis from which to calculate that number. The record does disclose, however, that approximately 26% of Missouri's population resides in these 841 local taxing jurisdictions. The State concedes that the additional use tax is a burden on interstate

commerce. Undaunted, the State argues that the additional use tax is not unconstitutional under the Commerce Clause because of the overall "de minimis" amount of discrimination that results in "practical operation". This argument is tantamount to a conclusion that 53.5% of the local taxing jurisdictions, and the 26% of the state's population that resides there, are constitutionally insignificant. I disagree.

The majority succumbs to this "close enough is good enough" theory, holding that "[w]hile in certain localities the use tax may exceed the sales tax" it is nonetheless not invalid under the Commerce Clause because it "does not discriminate against interstate commerce in purpose or practical effect." Maj. op. at 191, 192. The majority relies exclusively on *General American Tank Car Co. v. Day*, 270 U.S. 367, 46 S.Ct. 234, 70 L.Ed. 635 (1926), for the proposition that the Commerce Clause does not forbid a state to tax the use of goods purchased out-of-state at a higher rate than the sale of goods instate.

In *General American*, Louisiana had a statewide, ad valorem tax on all property located within the state. Each parish and municipality also imposed additional, local ad valorem taxes on the same property. The state constitution, however, exempted nonresident railroads from these local property taxes. Therefore, the state passed an additional statewide ad valorem tax on all "rolling stock" located in Louisiana operated by non-domiciliary corporations. This created a situation in which non-domiciliary railroads had to choose between: (1) declaring residency in Louisiana and paying the lesser of the state-local combined ad valorem taxes, or (2) remaining a nonresident and paying the greater state-state combined property taxes. The parties stipulated that there were some, unspecified locales in the state where the state-local combination was less than the state-state combination. Though there was no evidence of the specific rates in any specific location, the state asserted that the statewide average local rate was equal to the additional state tax, thus making the average state-local burden the same as the state-state burden.

The taxpayer in *General American* challenged the additional statewide tax as unconstitutional under two theories—the Commerce Clause and the equal protection/due process clauses. It argued that the average statewide state-local burden was 4-mill less than the state-state burden and, therefore, the tax was "a thinly disguised attempt to compel nonresidents doing interstate business in Louisiana to declare a domicile in the state" in contravention of the Commerce Clause. The Court rejected the Commerce Clause challenge, stating:

> [I]t is obvious ... that the tax in question is imposed on property of nonresidents in lieu of the local tax assessed in the several parishes of the state on property of persons or corporations domiciled there, and the nonresident may *either pay the state tax* assessed under [the state-state scheme] *or, at his option,* by becoming domiciled in a parish, *pay instead of it the local taxes* assessed [there].

*Id.* 270 U.S. at 372, 46 S.Ct. at 235. [Emphasis added.] This was the extent of the Court's Commerce Clause analysis in *General American.*

The remainder of the Court's decision in *General American,* including the portions upon which the majority in the present case bases its Commerce Clause holding, dealt exclusively with the taxpayers' challenge under the equal protection/due process clauses. The Court rejected these challenges, stating:

> *In determining whether there is a denial of equal protection* of the laws by such taxation, we must look to the fairness and reasonableness of its purposes and practical operation, rather than to minute differences between its application in practice and the application of the taxing statute or statutes to which it is complementary.

*Id.* 270 U.S. at 373, 46 S.Ct. at 236 (*quoted at* Maj. op. at 189, in Section IV, which begins on page 187 and which details the "standard to be applied for determining whether discrimination [against interstate

commerce] exists"). [Emphasis added.] The Supreme Court, speaking in dicta, extended its equal protection holding "even assuming" that the taxpayer's assertion of a 4–mill variance was correct:

> In the absence of a purpose to discriminate disclosed by the legislation itself we are not prepared to say that a 4 mills variation *in one year not shown to be a necessary and continuing result of the scheme of taxation* adopted would be an unconstitutional discrimination; for in such a scheme of complementary tax statutes however fairly devised it would be impossible to provide in advance against occasional inequalities as great as that here complained of.

*Id.* 270 U.S. at 373–74, 46 S.Ct. at 235–36. [Emphasis added.] The Court made clear, however, that "the record does not support the appellant's contention" of a variance. *Id.* 270 U.S. at 374, 46 S.Ct. at 236.

With respect, I believe *General American* is not controlling for at least four reasons. First, the majority relies on the due process and equal protection analysis in *General American* to support its conclusion that the Missouri additional use tax does not violate the Commerce Clause. The United States Supreme Court recently warned against confusing these two analyses.

> We have sometimes stated that the "*Complete Auto* test, while responsive to Commerce Clause dictates, encompasses as well ... Due Process requirement[s]." *Trinova Corp. v. Michigan Dept. of Treasury*, 498 U.S. [358], [373], 111 S.Ct. 818, 828, 112 L.Ed.2d 884 (1991). Although such comments might suggest that every tax that passes contemporary Commerce Clause analysis is also valid under the Due Process Clause, it does not follow that the converse is as well true: a tax may be consistent with Due Process and yet unduly burden interstate commerce. *See, e.g., Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987).

*Quill Corp. v. North Dakota*, —— U.S. ——, ——, 112 S.Ct. 1904, 1914, 119 L.Ed.2d 91 n. 7 (1992). I believe the majority has confused Commerce Clause analysis with due process/equal protection analysis here.

Second, *General American* does not deal with a compensatory tax scheme such as the sales/use taxes in the present case. Rather, it deals with an ad valorem tax and considers how a state may tax the instate property of nonresidents where its local taxing authorities are prohibited from doing so by its own constitution.

Third, *General American* contains an abbreviated, and now highly suspect, Commerce Clause analysis. The Court held that the tax did not violate the Commerce Clause because the taxpayer could "choose" the local taxes simply by declaring residence there. *General American*, 270 U.S. at 372, 46 S.Ct. at 235. I do not believe such a justification for burdening interstate commerce would now pass constitutional muster.

> We find no authority for the ... proposition advanced here that a tax that does discriminate against foreign commerce may be upheld if a taxpayer could avoid that discrimination by changing the domicile of the corporations through which it conducts its business. Our cases suggest the contrary.

*Kraft General Foods v. Iowa*, —— U.S. ——, ——, 112 S.Ct. 2365, 2370, 120 L.Ed.2d 59 (1992), (*citing Westinghouse Electric Corp. v. Tully*, 466 U.S. 388, 406, 104 S.Ct. 1856, 1867, 80 L.Ed.2d 388 (1984) (discriminatory tax exemption struck on Commerce Clause grounds); *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72, 83 S.Ct. 1201, 1205, 10 L.Ed.2d 202 (1963) (use tax struck on commerce grounds for violating "strict rule of equality").

Fourth, the *General American* Court viewed the variation between instate/outstate tax burdens as "an occasional inequalit[y]" that had occurred "one year" due to discrepancies in application "impossible" to avoid. The Court specifically distinguished these variances from ones that are "a necessary and continuing result of the scheme of taxation." Such a conclu-

sion is in sharp contradistinction to the present case, where the additional use tax—by virtue of the very "local option" sales taxes it ostensibly seeks to offset—must necessarily impose a continuing unconstitutional burden upon interstate commerce in that half of the state that has not elected to levy a 1.5% or higher local sales tax.

In its reliance on *General American*, the majority ignores a substantial line of authority reviewing the constitutionality of sales/use tax schemes under the Commerce Clause.

The United States Supreme Court's first detailed Commerce Clause analysis of a sales/use tax scheme is in *Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937). There, the State of Washington sought to compensate for the damage done to the competitive abilities of its instate sellers by the state's 2% sales tax by imposing a 2% tax on the "use" of goods in Washington that were bought out-of-state. The Court upheld this statutory scheme, stating:

> *Equality* is the theme that runs through all the sections of the statute.... When the account is made up, the *stranger from afar is subject to no greater burdens* as a consequence of ownership than the dweller within the gates.... Equality exists when the chattel subjected to the use tax is bought in another state and then carried into Washington. It exists when the imported chattel is shipped from the state of origin under an order received directly from the state of destination. *In each situation the burden borne by the owner is balanced by an equal burden where the sale is strictly local.*

*Id.* 300 U.S. at 583–84, 57 S.Ct. at 527–28. [Emphasis added.]

*Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963), involved a similar compensatory scheme of taxation. The state supreme court ignored certain inequalities in the taxation scheme and upheld the taxes on the grounds that those inequalities were merely "incidental." The United States Supreme Court expressly rejected Louisiana's creation of a "de minimis" (close enough for government work) exception to the Commerce Clause.

> The conclusion is inescapable: *equal treatment* for instate and out-of-state taxpayers similarly situated is the *condition precedent* for a valid use tax on goods imported from out-of-state.

*Id.* 373 U.S. at 70, 83 S.Ct. at 1204. The Court applied a strict rule of equality to its measure of "equal treatment." "[E]quality for the purposes of competition and the flow of commerce is measured in dollars and cents, not legal abstractions." *Id.* Because the Louisiana tax imposed a greater burden on out-of-state goods than on local sales, the Court struck down the Louisiana statutory taxes as violative of "the *strict rule* of equality adopted in [*Henneford*]." *Id.* at 73, 83 S.Ct. at 1206. [Emphasis added.]

Unlike *General American*, which has been cited only twice by the United States Supreme Court in the sixty-seven years since it was written, *see Gregg Dyeing Co. v. Query*, 286 U.S. 472, 482, 52 S.Ct. 631, 635, 76 L.Ed. 1232 (1932) (citing *General American* for its due process analysis only); *Charleston Federal Savings & Loan Ass'n.*, 324 U.S. 182, 190, 65 S.Ct. 624, 629, 89 L.Ed. 857 (1945) (same), *Henneford* and *Halliburton* have become principal mainstays of the Court's Commerce Clause jurisprudence. *See, e.g., Tyler Pipe*, 483 U.S. at 245–46, 107 S.Ct. at 2818–19 (*citing Henneford* and *Halliburton* for the principle that "equal treatment" is the constitutional prerequisite for a valid use tax under the Commerce Clause); *Williams v. Vermont*, 472 U.S. 14, 23, 105 S.Ct. 2465, 2471, 86 L.Ed.2d 11 (1985) (same); *Maryland v. Louisiana*, 451 U.S. 725, 759, 101 S.Ct. 2114, 2135, 68 L.Ed.2d 576 (1981) (same).

Through its Commerce Clause cases, the Court has repeatedly and expressly rejected attempts to justify facially discriminatory taxes on the grounds that the discrimination was merely "de minimis." After holding the system of credits and exemptions allowed under Louisiana's ostensibly

neutral "first use" tax to be unconstitutional, the Court struck down the tax and rejected a plea to remand for a hearing to determine the extent of the actual discrimination against interstate commerce, stating that "[w]e need not know how unequal the Tax is before concluding that it unconstitutionally discriminates." *Maryland v. Louisiana*, 451 U.S. at 760, 101 S.Ct. at 2136.

In *Westinghouse Electric*, the New York taxing authorities tried to salvage a facially-discriminatory tax on the grounds that the discrimination was "de minimis." The Court stated that "the extent of the discrimination does not affect our analysis," because "the Court need not know how unequal the Tax is before concluding that it unconstitutionally discriminates." *Westinghouse Electric*, 466 U.S. at 407, n. 13, 104 S.Ct. at 1867, n. 13.

Similarly, in *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), the Court refused to look the other way while Hawaii exempted from its 20% excise tax on wholesale liquor sales two varieties of tropical wines produced on the islands. Rejecting the state's argument that the discrimination was "de minimis" because the sale of these local wines was less than 1% of the total liquor sales, the Court stated that "[i]t is well-settled the '[w]e need not know how unequal the Tax is before concluding that it unconstitutionally discriminates." *Id.* at 269, 104 S.Ct. at 3054. The Court struck the entire forty-five million dollar tax, not just the exemption, on the basis of the state's discrimination in under one percent of sales.

"The common thread running though the cases upholding compensatory taxes is the equality of treatment between local and interstate commerce." *Maryland v. Louisiana*, 451 U.S. at 759, 101 S.Ct. at 2135. *See also Tyler Pipe*, 483 U.S. at 243, 107 S.Ct. at 2817 (same); *Boston Stock Exchange v. State Tax Comm'n.*, 429 U.S. 318, 331, 97 S.Ct. 599, 607, 50 L.Ed.2d 514 (1977) (same). Thus, a compensatory tax must, in actuality, be compensating for something. *Maryland v. Louisiana*, 451 U.S. at 758, 101 S.Ct. at 2135 ("first-use" tax struck because it did not compensate for a burden placed on local goods).

No better summary of the relevant law is possible than that given by the Court when, after reviewing its use tax jurisprudence, it stated:

> In all the use tax cases, an individual faced with the choice of an instate or out-of-state purchase could make that choice *without regard to the tax consequences.* If he purchased in State, he paid a sales tax; if he purchased out of State but carried the article back for use in State, he paid a use tax *of the same amount.* The taxes treated both transactions in the same manner.

*Boston Stock Exchange*, 429 U.S. at 332, 97 S.Ct. at 608. [Emphasis added.] In the present case, Missouri's 1.5% additional use tax is unconstitutional under this standard, by the parties own stipulations, in more than half the state. As such, it cannot stand.

A fair reading of the relevant cases, I believe, compels the conclusion that there is no de minimis exception to the Commerce Clause. The duty exacted by a state must be the same whether the goods subject to taxation originated instate or out-of-state— all of the time and in all of the state. Such a result is consistent with the view announced in *Quill Corp.* that "a bright-line rule in the area of sales and use taxes also encourages settled expectations and, in doing so, fosters investment by businesses and individuals." —— U.S. at ——, 112 S.Ct. at 1915.

Rather than draft a use tax that would conform to this bright-line, long-standing rule of constitutional law, the General Assembly made a rough "estimate" and assessed a flat 1.5% additional tax. The legislature's solution fails to ensure the equality required by the Commerce Clause.

With respect, I do not believe the constitutionality of Missouri's tax scheme here is even fairly debatable. This state's tax is simply unconstitutional.